UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
VINCENT P. DELUCA,                            :
                                              :
                          Plaintiff,          :
                                              :   Civil Case No. 06-CV-5474
                    v.                        :   (JGK)(KNF)
                                              :
THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.        :
                                              :
                          Defendant           :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANT THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.'S STATEMENT OF
UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

        Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the

Southern and Eastern Districts of New York, Defendant The Bank of Tokyo-Mitsubishi UFJ,

Ltd. ("BTMU" or the "Bank") submits this statement of material facts as to which it contends

there is no genuine issue to be tried.[1]

**Plaintiff's Employment at BTMU**

        1.        Plaintiff commenced his employment with The Bank of Tokyo, Ltd. on June 2,

1992, when he was 46 years of age.  (Deposition of Plaintiff Vincent Deluca ("Pl. Dep.") at 68:7-

11, 106:23-107:2.)

        2.        Plaintiff's date of birth is April 1, 1946.  (Kesselman Decl. Ex. G ¶ 14; Pl. Dep.

358:21-23.)

---

[1]        The undisputed facts set forth herein are followed by citations to their support in the record.  Copies of all
pleadings, deposition testimony and exhibits cited herein are annexed to the accompanying Declaration of Dov
Kesselman, dated August 28, 2007 ("Kesselman Decl.") and the Declaration of Thomas Hasek, dated August 28,
2007 ("Hasek Decl.").  Citations to deposition transcripts are shown as "[Witness Name] Dep. Page:Line".  Selected
pages from the following deposition transcripts are annexed to the Kesselman Decl.: Plaintiff Vincent DeLuca, Ex.
A; Masaru Kuroda, Ex. B; Mitsuhiro Yamawaki, Ex. C; Beryl Lewis, Ex. D; Thomas Hasek, Ex. E; and Gus
Browne II, Ex. F.

3.        Plaintiff's offer of employment, sent on or about May 13, 1992, set out the terms of Plaintiff's employment, and stated that he was being hired as an Investment Banking Specialist IV/Vice President in the Investment Banking Group at a salary of $115,000.00. (Kesselman Decl. Ex. H; Pl. Dep. at 106:23-107:7.)

4.        Plaintiff's employment with the Bank was at all times at-will, as set out in his offer letter and each of the employee manuals distributed to and received by Plaintiff during his employment.  (Kesselman Decl. Ex. I, Ex. J at 5, 94, Ex. K at 6, 118; Hasek Decl. Ex. J at 5, 94, Ex. K at 6, 115, Ex. L at 6, 117, Ex. M at 3, 115, Ex. N at 101:1, 103:1; Pl. Dep. at 63:17-65:20.)

5.        Two years after the start of Plaintiff's employment, on or about November 1, 1994, Plaintiff was promoted to Senior Vice President ("SVP").  At the time of his promotion, Plaintiff was 48 years of age.  (Pl. Dep. at 117:9-18; Kesselman Decl. Ex. H.)

6.        Plaintiff was responsible for the marketing function of BTMU's Securitization Group in the Americas, reporting to the Senior Vice President/Group Head responsible for the Securitization group within the IBDA, and to the General Manager for the Investment Banking Division for the Americas ("IBDA").  (Pl. Dep. 434:2-436:11; Kesselman Decl. Exs. L, M; Kuroda Dep. 16:4-18:9.)

7.        Between October 19, 2001 and through the remainder of Plaintiff's employment, Mr. Koji Baba, a Japanese national on temporary rotational assignment to the United States from the Bank's headquarters in Japan, was the SVP and Group Head for the Securitization Group in the United States.  (Hasek Decl. ¶ 3.)

8.        Between June 4, 2000 and June 4, 2004, Mr. Takashi Bamba was the General Manager for the IBDA.  Mr. Bamba was a Japanese national on temporary rotational assignment to the United States from the Bank's headquarters in Tokyo, Japan.  (Hasek Decl. ¶ 4.)

9.      Mr. Bamba's date of birth is --------------, 1951.  (Hasek Decl. ¶ 5.)[2]

10.      As of June 5, 2004, Mr. Bamba transferred back to BTMU's headquarters in Japan, and as of that date no longer had any responsibility for the IBDA or Plaintiff.  (Hasek Decl. ¶ 6.)

11.      As of June 18, 2004, Mr. Bamba was no longer employed by BTMU.  (Hasek Decl. ¶ 7.)

12.      Beginning June 4, 2004 and continuing throughout the remainder of Plaintiff's employment, Mr. Mitsuhiro Yamawaki replaced Mr. Bamba as the General Manager for the IBDA, and from that point forward Plaintiff reported to Mr. Baba and Mr. Yamawaki.  (Hasek Decl. ¶ 7; Kesselman Decl. Exs. L, M; Pl. Dep. 434:2-436:11.)

13.      Mr. Yamawaki's date of birth is ----------, 1955.  (Hasek Decl. ¶ 8.)

**BTMU's Well Established Policies To Prevent Discrimination**

14.      At all relevant times, BTMU maintained an equal employment opportunity policy which included a policy against discrimination and harassment on the basis of age, national origin, any other protected classification, as well as a non-discrimination/non-harassment complaint procedure.  (Pl. Dep. at 318:9-24; Kesselman Decl. Ex. Ex. J at 7-8, Ex. K at 10-13, 20; Hasek Decl. Ex. J at 7-8, 13, Ex. K at 9-12, 19, Ex. L at 10-13, 20, Ex. M at 7-10, 17, Ex. N at 104:1-104:2, 105:1.)

15.      BTMU's equal employment opportunity policy was contained in, among other places, its Employee Handbook, a copy of which was provided to every BTMU employee,

---

[2]      In order to protect the confidential nature of non-party personal information, the dates of birth (other than the year) of other employees have been redacted from the publicly filed document, in accordance with the United States District Court for the Southern District of New York's "Notice Regarding Privacy and Public Access to Electronic Civil and Criminal Case Files", and the Court and Plaintiff have been provided with a courtesy unredacted copy with the actual dates of birth.

including Plaintiff.  (Pl. Dep. at 63:17-64:25; Kesselman Decl. Ex. I, Ex. J at 7-8, Ex. K at 10-11; Hasek Decl. Ex J at 7-8, Ex. K at 9-10, Ex. L at 10-11, Ex. M at 7-8, Ex. N at 104:1-104:2, 105:1.)

16.     This policy mandates that BTMU's employment decisions be made "without regard to race, color, national origin, religion, age, sex, disability . . . or any other protected status."  Moreover, the policy provides that "[t]he Bank expressly prohibits any form of unlawful discrimination or unlawful harassment" and makes it the responsibility of supervisors and managers to create an atmosphere free of discrimination or harassment and to immediately report any information regarding discrimination or harassment to the Human Resources Group. Employees are warned that "unlawful harassment or unlawful discrimination by an employee will not be tolerated, and appropriate disciplinary action, up to and including termination of employment, will be taken against anyone who violates this Policy."  (Kesselman Decl. Ex. J at 7, Ex. K at 10; Hasek Decl. Ex. J at 7, Ex. K at 9, Ex. L at 10, Ex. M at 7, Ex. N at 104:1-104:2, 105:1.)

17.     Plaintiff was aware of the Bank's policy against discrimination and signed acknowledgements of receipt of the Bank's policies in this regard at various points throughout his employment, most recently on December 23, 2003.  BTMU also provided mandatory training seminars on the topics of diversity, sexual harassment and non-discrimination which Plaintiff attended because he realized that it was important to the Bank that he attend.  (Pl. Dep. at 304:2-15, 22-25, 318:9-24; Kesselman Decl. Exs. N, O.)

18.     BTMU's Employee Handbook also contained a policy on Corporate Comportment which emphasized that the Bank "expects employees to demonstrate professionalism and respect for each other and management in comportment, communications

and general performance of the job duties."  (Kesselman Decl. Ex. K at 7; Hasek Decl. Ex. L at 7, Ex. M at 4.)

19.     Plaintiff recognized that as a Senior Vice President of the Bank, he should be a leader.  (Pl. Dep. at 323:12-14.)

**BTMU's Established E-mail Policies**

20.     BTMU's Employee Handbook also contains a policy concerning the use of e-mail to ensure that its employees use its communication systems in a manner consistent with the Bank's legitimate business interests.  This policy clearly stated that e-mail is to be used solely for business-related purposes and is not to be used in a disruptive or offensive manner or one which violates the Bank's EEO policy.  BTMU's policy explicitly provided that the use of BTMU's e-mail system "to make discriminatory and/or harassing comments, vulgarities, obscenities, or disparaging comments is strictly prohibited."  (Kesselman Decl. Ex. J at 88-89, Ex. K at 108-110, Ex. P; Hasek Decl. Ex J at 88-89, Ex. K at 106-107, Ex. L at 108-109, Ex. M at 105-107, Ex. N at 412:1.)

21.     Plaintiff acknowledged his receipt and general familiarity with this policy as well.  (Kesselman Decl. Ex. P; Pl. Dep. at 318:25-319:11, 325:8-326:4.)

**Plaintiff's Sending of a Disrespectful and Racially Insensitive E-mail to His Supervisor, in Violation of Company Policy, After a History of Policy Violations and Warnings**

22.     In early May 2005, Plaintiff learned that Mr. Baba, his immediate supervisor and the SVP/Group Head of the Securitization Group, would be departing the New York office to return to the Bank's headquarters in Tokyo.  (Pl. Dep. at 362:4-363:6.)

23.     Upon learning that Mr. Baba would be returning to Japan, Plaintiff commented to him first by telephone and then later in person, on two separate occasions, that he had heard a

rumor that BTMU was opening a Baghdad office and that Mr. Baba was, in actuality, going to be transferred there.  (Pl. Dep. at 392:4-393:4, 393:22 -396:3.)

24.     Then, on May 3, 2005, Plaintiff sent an e-mail to Mr. Baba depicting a crowded office filled with Asian employees and denoted the subject matter of the e-mail "Your next Office."  (Kesselman Decl. Ex. Q.)

25.     In fact, Plaintiff deliberately selected this picture of Asian workers, working in very tight quarters, to send to Mr. Baba specifically *because* it depicted Asian employees: "I knew that Mr. Baba was going to Tokyo.  That is a country in Asia and the picture is of an office. I took a picture of an office in Tokyo, you were prone to find Asians in it. . . . They are not depicted in any stereotype except for the fact that it's crowded.  They don't have anything associated with Japanese or whatever.  If it was Chinese they *[sic]* stereotype could be some of the weird hats that they wear."  (Pl. Dep. 365:10-366:22.)

26.     Indeed, this picture was hand-picked by Plaintiff out of another e-mail that he received from colleagues at the Bank which contained a series of pictures depicting unpleasant workplaces and entitled "Quit moaning about your job!"  (Pl. Dep. at 363:23-364:8, 366:15-367:9; 368:25-369:12; Kesselman Decl. Ex. R.)

27.     Plaintiff attempted during his deposition to explain away the e-mail as a joke, claiming that it was merely a parody of the fact that Mr. Baba was being repatriated to Japan but did not know what his new assignment would be, and of the fact that Japanese offices are generally very crowded.  (Pl. Dep. at 362:11-363:12.)

28.     None of the individuals who reviewed the e-mail, however, believed it to be appropriate or funny.  (Yamawaki Dep. at 115:4-116:11; Lewis Dep. at 66:5-67:15; Hasek Decl. ¶ 11; Kuroda Dep. at 59:18-60:11.)

- 6 -

29.     Upon receiving Plaintiff's e-mail, Mr. Baba forwarded it to Mr. Thomas Hasek, the Senior Vice President and Group Head of Human Resources, and to Mr. Yamawaki, the General Manager of IBDA, seeking guidance as to how to handle what he described as "very offensive" comments made to him by Plaintiff.  (Hasek Dep. at 6:16-19, 90:15-91:11; Yamawaki Dep. at 6:19-22, 114:10-18, 116:5-11; Kesselman Decl. Ex. S.)

30.     Mr. Hasek reviewed the e-mail, and his reaction was that it was racially offensive towards Asians and that it was yet another instance of Mr. DeLuca acting in an unprofessional manner.  (Hasek Decl. ¶ 11.)

31.     Mr. Hasek is an American national employed by the Bank in the United States, and his date of birth is -----------, 1950.  (Hasek Decl. ¶¶ 1-2.)

32.     Mr. Yamawaki considered Plaintiff's May 3, 2005 e-mail both "inappropriate" and "childish."   He was disappointed and displeased by Plaintiff's "thoughtless action" particularly given Plaintiff's management role as a Senior Vice President in the Securitization Group.  (Yamawaki Dep. at 115:11-116:2.)

33.     Plaintiff's e-mail was also forwarded to Ms. Beryl Lewis, a Vice President in Human Resources who was responsible for the Securitization Group, as part of the Bank's review of Mr. Baba's complaint.  Ms. Lewis is an American national, and her date of birth is ------------, 1958.  (Lewis Dep. at 5:11-24, 8:9-14, 63:11-21; Kesselman Decl. Ex. T; Hasek Decl. ¶ 12.)

34.     Upon reading the e-mail, Lewis felt that it was offensive, racist, disrespectful and demonstrated a lack of corporate comportment.  (Lewis Dep. at 66:5-24, 67:2-15.)

35.     Mr. Masaru Kuroda, Japanese national on rotation in New York, testified that when he saw Plaintiff's May 3, 2005 e-mail, he was "surprised and shocked" by the picture in

the e-mail, and could not "understand why this picture was sent to Baba" and "thought it was an offense against the Japanese." (Kuroda Dep. at 59:18-60:11.)

36.     The following day, May 4, 2005, Mr. Baba sent another e-mail to Mr. Hasek and Mr. Yamawaki in which he sought to explain why he found Plaintiff's comments and e-mail so offensive and could not "take it as a simple joke." (Kesselman Decl. Ex. U.)

**Meeting Between Mr. Yamawaki, Mr. Baba and Human Resources Regarding Plaintiff's Actions**

37.     On May 4, 2005, Mr. Yamawaki and Mr. Baba met with Mr. Hasek and Ms. Lewis of Human Resources to seek their guidance on handling the situation and for a recommendation on how to proceed. (Hasek Dep. at 94:21-96:15; Lewis Dep. at 63:18-21, 64:13-68:5; Yamawaki Dep. at 114:10-18.)

38.     Mr. Yamawaki, for his part, believed that the e-mail was inappropriate and was deserving of some form of discipline, but was unsure of the appropriate response, and looked to Mr. Hasek and Ms. Lewis for their recommendation given their expertise in U.S. Human Resources law. (Yamawaki Dep. at 114:10-116:16.)

39.     Ms. Lewis observed that Mr. Baba was "visibly upset" by Mr. Deluca's May 3, 2005 e-mail. (Lewis Dep. at 64:23-65:25.)

40.     In considering the recommendation that should be made, Mr. Hasek and Ms. Lewis considered Plaintiff's May 3, 2005 e-mail itself, as well as prior issues with Plaintiff that they were aware of at the time. (Hasek Dep. at 240:21-243:23, Lewis Dep. at 66:2-68:5.)

**History of Plaintiff's Conduct Inconsistent with His Position as Senior Manager**

41.     Most recently, just two weeks earlier, on April 20, 2005, Plaintiff e-mailed Mr. Baba and another employee, Mr. Kuroda, in the context of discussions about a business issue involving a client, stating, "I can't believe how you arrive at your conclusion with respect to [a

particular client], <u>neither you nor Mr. Baba are professionals when it comes to this and you should listen to those who are</u>."  (Kesselman Decl. Ex. U; Pl. Dep. at 407:21-408:4.)

42.      Mr. Baba forwarded this e-mail to Mr. Hasek and Mr. Yamawaki on May 4, 2005, explaining that Mr. Deluca's actions "disgusted" him, that while Plaintiff subsequently apologized for his e-mail, it seemed to Mr. Baba that "he can say anything if he apologizes later [and] I can not accept such repeated actions."  (Kesselman Decl Ex. U.)

43.      Mr. Baba, Mr. Kuroda, Mr. Yamawaki, Ms. Lewis, and Mr. Hasek all viewed this e-mail as disrespectful and unprofessional.  (Kuroda Dep. at 59:18-60:11; Yamawaki Dep. at 114:10-18; Lewis Dep. at 66:2-68:5; Kesselman Decl. Ex. U.)

44.      Indeed, Plaintiff apologized "for the tone of [his] e-mail" and for having "acted emotionally." (Kesselman Decl. Ex. U; Pl. Dep. at 409:4-6; Hasek Dep. at 86:14-25; Kuroda Dep. at 86:25-87:24.)  Nevertheless, Plaintiff stated at his deposition that he did not believe that his comment was inappropriate, but rather was simply taken the wrong way by Messrs. Baba and Kuroda.  (Pl. Dep. at 412:16-413:14.)

45.      Just two weeks before this incident, on April 8, 2005, Plaintiff was criticized for his having shifted the blame to Mr. Baba for the assignment of a low "Achieves minus" rating to employee Laura Lee.  Plaintiff again apologized to Mr. Baba for not taking responsibility for the rating, for flip-flopping on the rating issue and for allowing the blame for the rating to be shifted to Mr. Baba, though Plaintiff apologized only because he was told that he should by Mr. Baba. (Kesselman Decl. Ex. V; Pl. Dep. at 422:20-426:20)

46.      Mr. Hasek and Ms. Lewis were also aware of and considered numerous other improper actions or violations of policy that Mr. Deluca had committed in the past.  For example, dating back to 2000, Plaintiff brought into compensation discussions with Human

Resources personnel and his supervisors a copy of a McLagan Report, which is a confidential survey containing compensation levels within the industry for various positions, and which is not available to the general public and should not have been in his possession.  At that time, Plaintiff was advised that the McLagan data was proprietary and confidential and that he should not be using it during his compensation discussions.  (Pl. Dep. at 233:7-8; Hasek Dep. at 82:15-83:13.)

47.     Yet, he disregarded this directive and again used this proprietary report during his compensation discussions in 2001, causing another "stir" with his supervisor.  (Pl. Dep. at 233:7-8; Hasek Dep. at 82:15-83:13.)

48.     Plaintiff had also been spoken to by Mr. Bamba and Ms. Lewis when he bypassed Human Resources in violation of Bank policy and guaranteed a particular compensation package to a new employee, John Zimmerman.  (Pl. Dep. at 227:8-11; Hasek Dep. at 78:7-20; Lewis Dep. at 99:14-101:5.)

49.     Despite having been taken to task for discussing compensation and making promises to Mr. Zimmerman, Plaintiff later again bypassed Human Resources and made compensation commitments on behalf of the Bank to BTMU employees Devang Sodha and Rachna Bare, again leaving to Human Resources the task of dealing with the consequences of these unauthorized offers.  (Hasek Dep. at 78:14-79:15.)

50.     On yet another occasion, Plaintiff flouted procedures again by unilaterally promising employee Bill Rainey, who had decided to voluntarily depart the Bank's employ, that he could be given a severance and retention package.  Plaintiff was counseled about this conduct as well.  (Pl. Dep. at 385:19-21; Hasek Dep. at 79:16-80:3; Lewis Dep. at 103:17-20; Yamawaki Dep. at 80:11-20.)

51.     While Plaintiff insists that he was not at fault for these acts, BTMU's Human Resources personnel clearly disagreed, and had this in mind in reaching their recommendation. (Lewis Dep. at 66:15-24; Hasek Dep. at 240:21-243:23.)

52.     Mr. Hasek and Ms. Lewis were also aware of another time when Plaintiff failed to follow HR procedures when Debra Greenblatt, a member of his staff complained to him about an improper anti-Semitic comment allegedly made to her by Mr. Zimmerman, another member of Plaintiff's group.  Instead of reporting the incident to Human Resources, Plaintiff tried to handle it on his own, but was unsuccessful, resulting in a complaint by Ms. Greenblatt to Human Resources that nothing had been done in response to her complaint.  Human Resources counseled Plaintiff about this situation as well and reminded him that should complaints come to his attention, he should advise Human Resources.  (Hasek Dep. at 84:9-85:18; Lewis Dep. at 101:9-18.)

53.     In or about 2003, the Bank's Human Resources department was told that Plaintiff had an inappropriate comment during a sexual harassment training class, asking the instructor when "we are going to get to the good stuff and start talking about sex."  (Hasek Dep. at 83:14-23.)[3]

54.     Mr. Hasek was also aware that in or around 2002, Plaintiff was counseled by Mr. Bamba for having permitted his subordinate, William Rainey, to appoint counsel in a transaction, which appointment created a potential conflict of interest between the lender and the borrower.  (Pl. Dep. at 222:18-227:7; Hasek Dep. at 85:19-86:13.)

---

[3]     Although Plaintiff denies that he engaged in this conduct, he noted that the instructor could have mistaken him for his subordinate, Mr. Rainey, who he claims might have made the statement since they often sat together during these sessions.  (Pl. Dep. at 309:7-311:22.)  In any event, the instructor reported to HR that it was, in fact, Plaintiff that made the comment.

**Plaintiff's Prior Performance Appraisals Had Identified His Conduct As a Leader and Role Model As An Area Requiring Improvement.**

55.     Plaintiff's performance evaluation for fiscal year 2005, the preparation of which began between mid-April and early May 2005 — prior to Plaintiff's May 3, 2005 e-mail — rated Plaintiff as "Achieves" but noted that he needed to "be more of a team player with other senior management;" to become "a self-disciplined, well mannered, and self-motivated leader;" "to respect senior management colleagues and subordinates;" "to be a positive role model for his subordinates to emulate;" and to "[p]ay more close attention to compliance with the Bank's rules and procedures: VP's case in 2004, mislead him about a severance package."  (Hasek Dep. at 235:18-25; Yamawaki Dep. at 76:17-23, 99:3-10; Kesselman Decl. Ex X; Hasek Decl. Ex. A at 1.)

56.     Plaintiff's performance evaluation for the prior year (2004) also rated him at the level of "Achieves," and similarly noted as areas for development "Need strong leadership to show the importance to abide rules and procedures."  (Kesselman Decl. Ex. Y; Hasek Decl. Ex. A at 1.)

57.     Plaintiff's performance evaluation for 2003 again noted as an area for development and growth, "Needs to improve level of coordination and emphasize more greatly a 'common purpose doctrine' within the group and between the Group", and "Needs to enhance all aspects of 'compliance', such as legal affairs policy," among other things.  (Hasek Decl. Ex. A, at 1.)

**After-Acquired Evidence of Plaintiff's Violations of Bank Policy By Sending Highly Inappropriate E-mails Confirms BTMU's Conclusions About Plaintiff**

58.     During discovery in this case, BTMU learned for the first time of e-mails sent by Plaintiff that were plainly in violation of BTMU's policies, and thus while not the basis for Plaintiff's termination, they further evidence that Plaintiff was not qualified to hold a senior

- 12 -

management role, and confirm the correctness of BTMU's conclusion that Plaintiff's employment should be terminated. (Hasek Decl. ¶ 14.)

59.     For example, on February 15, 2002 Plaintiff sent a multi-page e-mail to his subordinate, Van Dusenbury, which depicted the Miss World Beauty Contest. The e-mail contained pictures of scantily-clad women from Argentina, Denmark, Finland, France, Holland, Portugal, Samoa, Switzerland and the USA. In addition to the sexually inappropriate nature of these pictures, the e-mail also contained a grossly racist picture of Ms. South Africa, who was depicted as a gorilla in a bikini, and Miss Afghanistan who was depicted highly negatively. (Kesselman Decl. Ex. AA.)

60.     Incredibly, Plaintiff asserted that neither of these latter two pictures contained racial overtones, he believed them to be "harmless," and admitted that he did not give any thought as to what others at the Bank would think if they learned that a senior member of management was e-mailing pictures of scantily-clad women around the Bank. (Pl. Dep. at 328:2-335:11.)

61.     Yet, while he claimed not to know whether forwarding this e-mail was a violation of the Bank's e-mail policy, when forwarding the e-mail to his subordinate, Plaintiff asked Mr. Dusenbury to "please erase my name if you forward this any further." (Kesselman Decl. Ex. AA; Pl. Dep. at 331:24-333:13.)

62.     Plaintiff suggested that his e-mail was not inappropriate because in his view had had selected his audience carefully and took care not to send this e-mail to women or anyone that might take offense to it. (Pl. Dep. at 329:17-331:5.)

63.     Nonetheless, Plaintiff conceded that it is not a "good practice" to send pictures of semi-dressed women around the Bank via e-mail and that he was "guilty" of forwarding these pictures around the Bank.  (Pl. Dep. at 324:5-8, 325:4-7.)

64.     As another example, in February 2003, using his Bank e-mail account, Plaintiff forwarded an e-mail of a completely naked woman to two business associates with whom the Bank did business.  (Kesselman Decl. Ex. BB; Pl. Dep. at 336:4-337:8.)

65.     On October 1, 2002, Plaintiff used his Bank e-mail account to forward an e-mail entitled, "Chinese Couple's Wedding Night" which e-mail, in addition to containing an inappropriate joke, mocked Chinese accents.  Plaintiff admitted that he did not forward this e-mail to Mr. Baba since he understood that this was the type of "joke" to which Mr. Baba would be sensitive.  (Pl. Dep. at 353:5-357:12; Kesselman Decl. Ex. CC.)

66.     In December 2002, using his Bank e-mail account, Plaintiff forwarded to his subordinate, Mr. Rainey, an e-mail attachment which purported to be a picture of the front and back of the new Arkansas State quarter.  On the back of the quarter, which stated "Birthplace of Clinton" there was depicted a man and a woman behind a tree who appeared to be engaged in a sex act.   Plaintiff also sent this e-mail to his son at Bank of New York, even though the Bank's name was attached to the e-mail.  (Pl. Dep. at 346:18-350:3; 350:20-22; Kesselman Decl. Ex. DD.)

67.     Incredibly, Plaintiff took the position during his deposition that this e-mail was not inappropriate or violative of Bank policy, and that it was, in fact, "clever".  (Pl. Dep. at 348:15-25.)[4]

---

[4]     Plaintiff's perspective on what is appropriate workplace material is notable, as it makes clear that Plaintiff was not qualified to hold a senior management role.  It also sheds light on the reasonableness of his assessments, such that while Plaintiff suggested that he believed that his personal relationship with Mr. Baba was such that Mr. Baba would find his May 3, 2005 e-mail funny (Pl. Dep. at 363:13-23), Mr. Kuroda, who ultimately filled Mr.

68.     Plaintiff conceded that he should not have transmitted these e-mails.  (Pl. Dep. at 337:9-22.)

69.     Plaintiff did not forward any of these e-mails to Mr. Bamba or Mr. Baba.  (Pl. Dep. at 350:23-351:13.)

70.     In December 2003, using his Bank e-mail account, Plaintiff sent an e-mail to Steven Sawyier, an outside attorney who worked with the Bank, in which he called Sawyier a "fucking old lady" because Sawyier was, according to Plaintiff, overly concerned about when he would be paid for work he had done.  Plaintiff did not consider his e-mail to be derogatory or offensive to Sawyier.  (Kesselman Decl. Ex. EE; Pl. Dep. at 357:24-361:20.)

71.     Had the Bank known about the continuing and flagrant misuse of its e-mail system by a senior manager, who it expected to be a role model and leader, it would have terminated Plaintiff's employment sooner.  (Hasek Decl. ¶ 14.)

**The Decision to Terminate Plaintiff's Employment After the May 3, 2005 E-mail**

72.     As a result of this background, when Mr. Hasek and Ms. Lewis were informed of Plaintiff's racially insensitive e-mail, it was the "last straw" in a series of incidents involving Plaintiff's lack of appropriate corporate comportment, and Mr. Hasek and Ms. Lewis recommended to Mr. Yamawaki that Plaintiff's employment be terminated.  (Hasek Dep. at 241:2-242:25, 258:20-259:15, 264:10-13; Lewis Dep. at 66:4-68:15, 89:7-12.)

73.     Upon being told HR's recommendation, Mr. Yamawaki initially noted his concern that Plaintiff's termination would impact BTMU's securitization business, but nonetheless ultimately agreed with HR's recommendation.  (Lewis Dep. at 64:13-68:5, 72:23-73:7; Yamawaki Dep. at 118:23-119:3, 134:16-135:6.)

---

Baba's position after his departure, testified that Mr. Baba was "a pretty serious person in the workplace, so there is not so many jokes."  (Kuroda Dep. at 43:12-16.)

74.     As a result, on May 6, 2005, Mr. Yamawaki advised the Global Head of Securitization in Japan, Mr. Tetsuga Sato, that he intended to terminate Plaintiff's employment because of his recent conduct with respect to Mr. Baba and his prior incidents "that leave questions about his qualifications as an SVP," but that, because of his contributions over the years, severance pay should still be considered.  (Yamawaki Dep. at 137:19-138:13; Kesselman Decl. Ex. FF.)

75.     On May 7, 2005, Mr. Yamawaki wrote a follow-up e-mail to Mr. Sato explaining that "this matter happened when we were planning to significantly expand securitization activities, and considering the negative impact on business development, we were forced to make a difficult decision.  I don't think we can avoid the short-term impact on business, but [we] reached this decision by thinking about the positive effect overall . . . the individual [Plaintiff] up to now repeatedly has made inappropriate comments during bank meetings and spoken and behaved inappropriately toward colleagues and supervisors, and this incident is not the only one.  As an SVP he was required to have a strong ethical sense and self control, I concluded that he is not suitable for management, and upon consulting with both personnel and legal, I made this decision.  (Kesselman Decl. Ex. GG.)

76.     Mr. Yamawaki also met briefly with Mr. Kyota Omori, the Chief Executive Officer for the Americas, to inform Mr. Omori that he had reached the decision to terminate Plaintiff's employment after having sought the advice of Human Resources and Legal, showing Mr. Omori Plaintiff's May 3, 2007 e-mail, and advising that he was in the process of obtaining approval from Tokyo.  (Yamawaki Dep. at 179:19-180:21.)

77.     Mr. Omori was not involved in the decision to terminate Plaintiff's employment beyond having been advised by Mr. Yamawaki of his decision.  Mr. Yamawaki and the IBDA

for which he was responsible did not even report into Mr. Omori, but instead reported in to Mr. Satou and Mr. Akigusa in BTMU's headquarters in Japan.  (Yamawaki Dep. at 162:16-163:11, 179:19-180:21; Hasek Dep. at 236:13-20, 245:10-12, 247:14-23; Lewis Dep. at 140:5-7.)

78.     Mr. Yamawaki also sent a memorandum to HR on May 10, 2005 formally summarizing the issues that prompted Plaintiff's termination.  (Hasek Decl. Ex. A.)

79.     In accordance with Bank procedures, Mr. Yamawaki directed the preparation of a Request of Termination for Human Resources which was initially drafted by Mr. Baba, and which Mr. Yamawaki reviewed and signed.  The Request identified the reasons for Plaintiff's termination, and highlighted his shortcomings with respect to teamwork with other senior management, leadership, role modeling of junior staff, and adherence to Bank policies and procedures.  The Request noted that his performance appraisals since 2002 had identified these areas as ones in which improvement was needed, but that he had failed to improve.  (Yamawaki Dep. at 152:12-24; Hasek Decl. Ex. A at 1.)

80.     Mr. Yamawaki also decided that Plaintiff would receive a bonus of $410,000 for his business performance for the prior year out of a view that fairness directed that since the termination was prompted by Plaintiff's e-mail sent after the conclusion of the fiscal year upon which the bonus was based, and he did not wish to withhold this bonus from Mr. Deluca, though he could have done so.  (Hasek Dep. at 236:21-237:11.)

81.     At the time that Mr. Yamawaki made the decision to terminate Plaintiff, he was almost fifty (50) years of age.  (Yamawaki Dep. at 6:11-12.)  Mr. Yamawaki terminated only one other person for violation of company policy, and that was a woman who was thirty-five years of age.  (Yamawaki Decl. ¶ 4.)

**Plaintiff is Informed of His Termination**

82.     On May 12, 2005, Mr. Yamawaki called Plaintiff into a meeting in the HR Department.  (Pl. Dep. at 455:11-456:4.)

83.     Mr. Yamawaki informed Plaintiff that because his work performance from a business perspective had been rated as Achieves for 2004, he would be receiving a bonus of $410,000 for the job that he had done.  However, Mr. Yamawaki continued that Plaintiff's thoughtless actions with respect to Mr. Baba and particularly his May 3, 2005 e-mail was inappropriate and disappointing, and BTMU was therefore terminating his employment for the various e-mails and comments sent to Mr. Baba.  (Pl. Dep. at 456:14-457:9; Hasek Dep. at 248:12-17; Yamawaki Dep. at 168:2-24.)

84.     When Mr. Yamawaki left the room, Mr. Hasek explained the severance package that the Bank was offering Plaintiff.  Mr. Hasek also offered Plaintiff early retirement in an effort to protect Plaintiff's reputation, rather than people knowing that his employment had been terminated.  (Pl. Dep. at 460:8-461:14; Hasek Dep. at 259:25-262:7.)

85.     Upon realizing the consequences of his e-mail, Plaintiff apologized to Mr. Hasek for "screw[ing] up,"  however Mr. Hasek told him that the decision had been made and would not be changed.  (Hasek Dep. at 267:25-269:7.)

86.     In order to spare Plaintiff the embarrassment of being escorted by security to clean out his desk, Mr. Hasek advised Plaintiff that he would make arrangements for Plaintiff to return to the office to remove his personal belongings either before or after hours.  They also discussed the substance and manner of announcement to the staff about Plaintiff's departure. (Hasek Dep. at 262:4-13, 269:19-270:21.)

**Plaintiff Cannot Point to Any Discriminatory Comments By Any of
the Three Individuals Involved in the Decision to Terminate His Employment.**

87.     When asked to identify any purportedly age-based comments made to him, Plaintiff identified Mr. Yamawaki, Mr. Bamba, Mr. Omori, and Mr. Baba.  (Pl. Dep. at 201:2-203:8, 204:20-22, 205:16-20, 209:2-210:6, 214:7-217:14, 264:2-266:23.)

88.     Neither Mr. Hasek nor Ms. Lewis ever made any age-based or national origin-based comments to Plaintiff.  (Pl. Dep. at 202:5-24, 209:2-6.)

*A.     Comments Allegedly Made By Mr. Yamawaki*

89.     Plaintiff identified one age-related comment by Mr. Yamawaki.  Specifically, during a conversation between Mr. Yamawaki and Plaintiff in which they were discussing their children, Mr. Yamawaki commented about himself in this context that he was getting old. Plaintiff asserts that Mr. Yamawaki would have been aware of Plaintiff's own age.  (Pl. Dep. at 196:8-197:9.)

90.     Notably, Plaintiff did not find the comment to be disparaging or discriminatory at the time, and that his conversation with Mr. Yamawaki was "as one friend would to another." (Pl. Dep. at 200:10-21, 196:15-25.)

*B.     Comment Allegedly Made By Mr. Omori*

91.     Plaintiff also identified a single comment by Mr. Omori relating to age at a Bank Holiday party in 2004.  According to Plaintiff, while he and Mr. Omori shared drinks with one another and wished each other a Merry Christmas, they were discussing the birthdays of various staff, and Mr. Omori commented about how it felt for him (Mr. Omori) to be getting older, that he (Mr. Omori) was one of the oldest Japanese nationals at the Bank, but that he was not the oldest employee at the Bank.  In fact, Mr. Omori was only one year younger than Plaintiff.  (Pl. Dep. at 201:2-202:13.)

92.     Plaintiff admitted that he did not take offense to this comment and did not feel that Mr. Omori was insulting his age.  (Pl. Dep. 202:5-10.)[5]

C.     *Comments Allegedly Made By Mr. Baba*

93.     Plaintiff recalled one specific incident in which Mr. Baba called Plaintiff an "old man," though he guessed that Mr. Baba may have done so at least ten times.  (Pl. Dep. at 202:24-203:8, 204:20-22, 205:16-20.)

94.     Specifically, the only actual conversation recalled by Plaintiff was in either 2001 or 2002.  At that time, Mr. Baba was participating in the Bank's annual walk-a-thon and sent a general e-mail to colleagues at the Bank seeking sponsors.  Plaintiff stated that because Mr. Baba is slight in stature, Plaintiff joked that he would sponsor Mr. Baba at $20.00 a mile if Mr. Baba would carry around an extra 20 pounds.  Mr. Baba responded "ha, ha, okay but remember this, I have to carry the flag or words to that effect for the group because you are too old, because you are an old man."  (Pl. Dep. at 203:4-206:4.)

95.     Plaintiff admitted that he understood this comment to be nothing more than a joke, that he did not got to Human Resources about it, and that had he believed that it was a discriminatory comment, he would have gone to Human Resources.  (Pl. Dep. at 206:12-23.)

D.     *Comments Allegedly Made By Mr. Bamba*

96.     Plaintiff alleges that Mr. Bamba made comments during a conversation that occurred around bonus time once in 2002 and once in 2003 which were allegedly age-related. (Pl. Dep. at 209:19-210:6.)

---

[5]     Plaintiff admitted that he did not take offense or ascribe discriminatory intent to any of the neutral comments that he alleged while he was at the Bank, and it was only after his employment ended that he suddenly decided that every age-related comment was made with discriminatory intent, irrespective of the obviously non-discriminatory context.  (Pl. Dep. 202:7-10.)

97.     Specifically, on or around April 16, 2002, Plaintiff met with Mr. Bamba to discuss the reduction of his bonus from $670,000 in 2001 to $570,000 in 2002.  Mr. Bamba advised Plaintiff during that conversation that he could not continue paying high compensation packages to four senior people in the group and, according to Plaintiff, Mr. Bamba then added that Plaintiff's position was "blocking the advancement of the younger people" in the group. Plaintiff allegedly responded to Mr. Bamba that if he was promoted to a higher position, his position would then be open for promotion of one of the junior people, but according to Plaintiff, Bamba scoffed at that idea.  (Pl. Dep. at 214:7-217:14.)

98.     Plaintiff recalled a similar conversation on or around May 16, 2003, in the context of Plaintiff's bonus and his complaint about the amount of his bonus, during which Mr. Bamba allegedly stated that the Bank could not afford to pay everyone large amounts of compensation and that in order to attract junior people, the Bank needed to be able to advance junior employees.  (Pl. Dep. at 264:2-266:23.)

99.     At that point, Plaintiff allegedly questioned Mr. Bamba as to whether he was trying to force Plaintiff's early retirement, which Mr. Bamba denied, but then offered to obtain a package for him if Plaintiff chose to retire early.  (Pl. Dep. at 268:4-269:16.)

E.      *Plaintiff Alleges No Other Discriminatory Comments*

100.    The only other remotely age-related comments alleged by Plaintiff were alleged conversations with unidentified Americans or Japanese home staff (i.e., Japanese nationals on rotation in the United States) in which Plaintiff would discuss his family, the fact that he had a 34-year-old son, and the reactions of people who would comment that they were surprised that he could have a 34-year-old son because he looked so young.  Plaintiff did not view these

comments as offensive or discriminatory at the time, nor did he report these conversations to Human Resources.  (Pl. Dep. at 268:13-22.)

101.    Notably, Plaintiff admitted that he did not find any of comments — with the exception of Mr. Bamba's comments in April 2002 and May 2003 — to be disparaging or discriminatory at the time that they were made, nor did he report any of the comments to Human Resources.  In fact, it was not until after he was terminated that Plaintiff decided that any time age was mentioned, in any context, an act of discrimination had occurred.  (Pl. Dep. at 200:10-21, 202:7-10, 206:12-23, 207:18-208:2.)

**The Evidence, including Plaintiff's Salary and Bonus History at BTMU Shows that Plaintiff's Age was Not an Issue**

102.    Plaintiff acknowledged that he was 46 years of age at the time he was hired by the Bank and that the Bank did not engage in age discrimination at the time he was hired.  (Pl. Dep. at 68:7-69:19.)

103.    Upon Plaintiff's departure from the Bank, his subordinate, Mr. Van Dusenbury, assumed many of his responsibilities.  Mr. Dusenbury's date of birth is ---------, 1954, he was 51 years old when he took over Plaintiff's responsibilities upon Plaintiff's termination, and he remains in that role to date.  (Hasek Dep. at 282:3-7; Hasek Decl. ¶ 10.)

104.    The following is a list of employees in BTM's Securitization group as of the date of Plaintiff's termination, and readily shows that half of the employees were over 40 years of age, and nearly a quarter of them (22%) were (like Mr. DeLuca) over the age of 50:

| Securitization Group Employees[6] (as of May 12, 2005) | | |
|---|---|---|
| **Name** | **Date of Birth[7]** | **Age** |
| Stephen Adams | --/--/67 | 37 |
| Andrea Alkins | --/--/69 | 35 |
| Hermina Batson | --/--/68 | 37 |
| Elizabeth Colon | --/--/65 | 40 |
| Shinichi Cowe | --/--/71 | 34 |
| John Donaghue | --/--/50 | 55 |
| Van Wyck Loomis Dusenbury | --/--/54 | 51 |
| Debra Greenblatt | --/--/52 | 52 |
| Philip Larusso | --/--/69 | 35 |
| Laura Lee | --/--/67 | 38 |
| Ann Lewis | --/--/52 | 52 |
| Luna Mills | --/--/69 | 35 |
| Yoko Mock | --/--/63 | 42 |
| Sandra Pinchin | --/--/69 | 35 |
| Christopher Pohl | --/--/63 | 42 |
| Aditya Reddy | --/--/60 | 45 |
| Devang Sodha | --/--/71 | 34 |
| Wai-Kwong Yee | --/--/64 | 40 |

(Hasek Decl. ¶ 10.)

105.    At the time he was hired, Plaintiff received a salary of $115,000.00 and a sign-on bonus of $35,000.00.  (Pl. Dep. at 116:4-117:3; Kesselman Decl. Ex. HH.)

---

[6]     In addition to the New York-based employees, the Securitization group also included the following Home Office employees who were on assignment in New York from Tokyo:  Suguru Hattori (DOB: -/-/65, Age: 40), Akira Kawashima (DOB: -/-/71, Age: 34), Masaru Kuroda (DOB: -/-/63. Age: 42), Hajime Muto (DOB 12/25/71, Age: 33), and Yuzo Nakada (DOB: -/-/68, Age: 36).  (Hasek Decl. ¶ 10.)

[7]     In order to protect the confidential nature of non-party personal information, the dates of birth (other than the year) of other employees have been redacted from the publicly filed document, in accordance with the United States District Court for the Southern District of New York's "Notice Regarding Privacy and Public Access to Electronic Civil and Criminal Case Files", and the Court and Plaintiff have been provided with a courtesy copy of the actual dates of birth.

106.     Plaintiff's bonus increased each year from the time of his hire through 2000. (Pl. Dep. at 118:14-21.)  Specifically, Plaintiff was awarded bonuses as follows:

| Date | Bonus Amount |
|------|--------------|
| 1994 | $40,000 |
| 1995 | $105,000 |
| 1996 | $135,000 |
| 1997 | $225,000 |
| 1998 | $270,000 |
| 1999 | $320,000 |
| 2000 | $670,000 |

(Kesselman Decl. Ex. HH; Pl. Dep. at 116:2-118:25.)

107.     On May 15, 2000, when Plaintiff was 54 years of age, BTMU more than doubled Plaintiff's bonus to $670,000.00, bringing his total compensation that year to $850,000.00.  (Pl. Dep. at 55:12-15, 68:7-11, 118:22-25; Kesselman Decl. Ex. HH.)

108.     This bonus was paid to Plaintiff after he sent a memo to BTMU management on March 13, 2000 stating that he believed that he was not being paid comparable to the market, and intimated that he would leave the Bank if his compensation was not increased, noting that "I take pride and make no secret of my overall satisfaction with the results I have achieved in my position at BTM.  However, I do not want my attitude to be mistaken for complacency, for I owe it to myself and to my family to be compensated as well as my peers at other institutions." (Kesselman Decl. Ex. II.)

109.     BTMU, in an effort to keep Plaintiff in its employ, decided to increase Plaintiff's bonus in response to his memorandum, noting that the Bank did not "want to run the risk of losing Vince whose departure can possibly result in a 'group defection' of Vince and his associates."  The Bank's internal e-mail clarified that current market conditions were fueling the

- 24 -

increases for securitization group members and that the future situation "about two years from now" was unknown.  (Hasek Decl. Ex. I.)

110.     The following year, on May 14, 2001, Mr. Bamba authorized and BTMU paid another bonus to Plaintiff of $670,000.00, bringing his total compensation for that year to $850,000.00.  (Pl. Dep. at 55:12-15, 87:21-25.)

111.     At the time of Plaintiff's award of this $670,000 bonus by Mr. Bamba, Plaintiff was 55 years of age.  (Kesselman Decl. Ex. HH.)

112.     During this same time period of 1994 to 2000, Plaintiff's salary increased as well.  (Kesselman Decl. Ex. HH; Pl. Dep. at 116:2-117:3.)

113.     Although Plaintiff claims that his compensation package was below market, Plaintiff admits that BTMU had the right to pay at below market rates and that, in any event, he was nonetheless satisfied with his compensation in 2000 and 2001.  (Pl. Dep. at 55:12-15, 21-22, 119:12-20.)

114.     Beginning in 2002 or 2003, the job market became tight and positions at Plaintiff's level were fewer than they had been in previous years.  Plaintiff admits that Mr. Bamba was aware of the tightening in the job market and, as a result of that and internal cost-cutting efforts, reduced bonus levels in 2002.  (Pl. Dep. at 45:11-47:25, 48:22-24; Kesselman Decl. Ex. JJ.)

115.     Plaintiff further admits that during his conversations with Mr. Bamba about bonuses, Mr. Bamba had previously advised Plaintiff that he had high expectations for his Senior Vice Presidents that were not fully met by Plaintiff, expected Plaintiff to be more sensitive to internal controls, that he had heard negative comments about Plaintiff from those in the oversight functions of the Bank; and that Mr. Bamba would become angry that Plaintiff went around Mr.

Bamba to receive approval from others for particular transactions which Mr. Bamba would not approve.  (Pl. Dep. at 217:15-20, 221:11-222:17.)

116.     As a result, during this period of time, Mr. Bamba reduced Plaintiff's bonuses from the highest bonus levels obtained after Plaintiff's March 13, 2000 memorandum, such that Plaintiff's bonus paid in May 2002 was $590,000, his bonus in May 2003 was $425,000, and his bonus paid on May 13, 2004 was $410,000.  (Kesselman Decl. Ex. HH.)

117.     Indeed, Plaintiff explicitly admitted in a letter to Mr. Yamawaki on February 11, 2005 that his lowered bonus levels were because "conscious decisions were made to reduce what he [Mr. Bamba] considered to be inflated compensation, during periods of poor job opportunity." (Kesselman Decl. Ex. JJ.)

118.     Notwithstanding the reduced bonuses, Plaintiff's bonuses were still among the highest in the entire Bank in the Americas, and were by far the highest in the securitization group.  (Hasek Decl. ¶ 9.)  The bonuses for the Securitization group between 2002 and 2004 were as follows:

| Name[8] | 2002 | 2003 | 2004 |
|---|---|---|---|
| Vincent DeLuca | 590,000 | 425,000 | 410,000 |
| -------------------- | 260,000 | 275,000 | 265,000 |
| -------------------- | 275,000 | 250,000 | 245,000 |
| -------------------- | 60,000 | 90,000 | 115,000 |
| -------------------- | 100,000 | 75,000 | 90,000 |
| -------------------- | 70,000 | 70,000 | 65,000 |
| -------------------- | 60,000 | 65,000 | 85,000 |
| -------------------- | 32,500 | 31,500 | 34,000 |
| -------------------- | 37,500 | 35,000 | 37,000 |
| -------------------- | n/a | 85,000 | 85,000 |
| -------------------- | n/a | n/a | 10,000 |
| -------------------- | 45,000 | 20,000 | 15,000 |
| -------------------- | 6,000 | 5,100 | 6,000 |

---

[8]      In order to protect the confidential nature of non-parties' compensation information, the names of the other employees have been redacted from the publicly filed document, and the Court and Plaintiff have been provided with a courtesy copy of the actual names.

| Name[8] | 2002 | 2003 | 2004 |
|---|---|---|---|
| --------------------- | 7,000 | 5,000 | 4,000 |
| --------------------- | 4,000 | 3,500 | 3,500 |
| --------------------- | 2,000 | 1,600 | 2,000 |
| --------------------- | 4,000 | 3,000 | 3,000 |
| | 1,000 | 1,000 | 1,000 |

(Hasek Decl. ¶ 9.)

119.     Beginning in the summer of 2004, Plaintiff began to report to Mr. Yamawaki, who had a different style than Mr. Bamba and approved various initiatives that Plaintiff was attempting to put in place. (Pl. Dep. at 194:13-18, 195:2-6.)

120.     Plaintiff and Mr. Yamawaki got along well, though Plaintiff was aware that Mr. Yamawaki did not like certain of his personal traits, such as interrupting another person while he or she was speaking, and would often caution him against such conduct.  (Pl. Dep. at 195:14-24.)

**Plaintiff's Attempt to Suggest Age Discrimination by Selectively Identifying Individuals Who Were Older Than Fifty at the Time of Their Termination Is Without Basis.**

121.     In support of his claim of age discrimination, Plaintiff identified various individuals who he alleged were forced to leave BTMU involuntarily because they were approaching the age of fifty-five years of age, including, Dimitri Uglialoro, Frank Ziella, Richard Krollman, John O'Connor, James Wallace, Jack Demes, John Valentino, Lewis Hart, Gary Ladolcetta, John McIntyre, Eugene Nostrame, Heinz Junge, Gus Browne, William Rhodes, Carol Goldin, Carol Preisinger, George Lee, and Paul Harinstein.  (Pl. Dep. at 150:6-10, 193:11-194:12; Kesselman Decl. Ex. KK, Ex. G ¶ 41.)

122.     However, Plaintiff has no personal knowledge as to the circumstances of the departures of any of these people, other than they were allegedly over the age of 50 when they left BTMU.  (Pl. Dep. at 150:15-194:12, 150:15-151:13 (Uglialoro); 151:14-154:4 (Ziella); 154:5-156:9 (Krollman); 157:10-159:23 (O'Connor); 30:19-31:16 (Preisinger); 193:11-194:12

(Lee, Harinstein); 191:13-193:10 (Rhodes); 188:10-189:6 (McIntyre, Nostrame, Junge and Goldin).)

123.    In fact, seven of the twenty individuals identified by Plaintiff were actually hired by BTMU when they were already <u>over the age of 50</u>, and another nine were hired when they were already over the age of 40. (Hasek Decl. ¶ 17 (chart below).)

124.    Nor is there any trend of individuals being terminated at age 50 or 55 — to the contrary, numerous of the individuals identified by Plaintiff left the Bank in their 60s and late 50s.  (Hasek Decl. ¶ 17.)

125.    The ages of the employees selectively identified by Plaintiff at the time of their hire and termination, together with their dates of hire and termination, are as follows:

| Name | Date of Birth | Date of Hire | Age at Date of Hire | Date of Termination | Age at Date of Termination |
|------|---------------|--------------|---------------------|---------------------|----------------------------|
| John O'Connor | --/--/1937 | 10/6/1997 | 60 | 6/2/2000 | 62 |
| Eugene Nostrame | --/--/1942 | 5/7/2001 | 58 | 7/13/2005 | 62 |
| John McIntyre | --/--/1936 | 7/1/1991 | 54 | 6/30/2003 | 66 |
| William Rhodes | --/--/1943 | 3/2/1998 | 54 | 5/21/2004 | 60 |
| Lewis Hart | --/--/1945 | 10/13/1998 | 53 | 3/14/2003 | 57 |
| Paul Harinstein | --/--/1947 | 6/12/2000 | 53 | 1/2/2002 | 54 |
| Richard Krollman | --/--/1948 | 1/4/1999 | 51 | 1/6/2004 | 56 |
| Carol Preisinger | --/--/1949 | 8/10/1998 | 49 | 4/19/2002 | 53 |
| Gary Ladolcetta | --/--/1953 | 1/8/2001 | 47 | 5/20/2003 | 50 |
| Heinz Junge | --/--/1940 | 10/1/1987 | 47 | 3/12/2004 | 64 |
| Dimitri Uglialoro | --/--/1940 | 11/10/1986 | 46 | 6/30/1998 | 57 |
| John Valentino | --/--/1940 | 6/23/1986 | 45 | 6/30/1997 | 56 |
| James Wallace | --/--/1947 | 9/4/1990 | 43 | 1/2/2004 | 56 |
| George Lee | --/--/1954 | 4/7/1997 | 43 | 4/8/2002 | 48 |
| Gus Browne II | --/--1944 | 3/2/1987 | 43 | 3/31/2005 | 61 |

| Jack Demes | --/--/1946 | 6/6/1988 | 41 | 3/31/2005 | 58 |
|---|---|---|---|---|---|
| Frank Ziella | --/--/1948 | 9/24/1984 | 36 | 7/14/2000 | 51 |
| Thomas Vassar | --/--/1943 | 3/1/1973 | 29 | 6/17/2002 | 58 |
| Carol Goldin | --/--/1949 | 11/10/1978 | 29 | 5/30/1997 | 48 |
| Judith Wood | --/--/1943 | 9/13/1961 | 17 | 3/14/2002 | 58 |

(Hasek Decl. ¶ 17.)

126.     The circumstances of the departures of each of the individuals identified by Plaintiff differ from Plaintiff as well, with a significant number of individuals having been part of broader restructurings.  For example, Mr. Hart's position was eliminated in a restructuring of the utilities and energy group in which he worked in the after-math of the Enron fiasco, because profitability of the group had declined.   A total of four individuals were impacted by this restructuring; the ages of the other three individuals were 25, 35, and 40.  (Hasek Decl. Ex. B; Hasek Dep. at 164:12-165:23, 169:17-22; Pl. Dep. at 179:5-183:17.)

127.     Mr. Browne's termination of his employment was also part of a restructuring. As a result of personal issues that Mr. Browne had been going through, he approached Human Resources about a year prior to his departure and asked to be considered for other opportunities or alternatively to receive a severance package.  Upon the reorganization of his department, Mr. Browne was offered to head the newly reorganized group and remain with the Bank.  Mr. Browne opted instead for the severance package, and remained at BTMU for several months to assist in the reorganization and select a replacement.  Mr. Browne suggested Vic Pierzchaiski, a highly rated member of Browne's credit team, to lead the newly reorganized credit group. (Browne Dep. at 26:15-22, 27:16-22, 24:21-25:6, 28:2-29:17, 30:5-18, 57:14-19, 57:23-58:10; Hasek Dep. at 177:20-183:18; Hasek Decl. Ex. C.)

128.     As part of the same restructuring, Mr. Jack Demes, another individual identified by Plaintiff, saw his position eliminated.  Plaintiff admitted that the position held by Mr. Demes, who had a similar position to William Paine, was deemed redundant after their groups merged. Mr. Paine was selected to remain because he had the relationship with client Ford, an important client which generated significantly higher revenues than Mr. Demes' client relationships. Plaintiff was in fact polled at the time as to whether Mr. Demes or Mr. Paine was more effective, and Plaintiff responded that they had similar skills, but that Mr. Paine controlled the large and lucrative Ford account.  Mr. Paine was retained because he ran the Ford account.  (Hasek Dep. at 156:10-157:24, 163:2; Hasek Decl. Ex. C; Pl. Dep. at 170:15-176:23.)

129.     Mr. Wallace's position was also eliminated as part of a restructuring of U.S. Corporate Banking.  Mr. Wallace held the title of Executive Vice President of U.S. Corporate Banking, which had five groups reporting to it, each with a Senior Vice President heading the group, was a position which became unnecessary and was eliminated in a restructuring.  (Hasek Dep. at 142:13-145:16, 163:15-22; Hasek Decl. Ex. D.)

130.     As to Mr. Ladolcetta, Plaintiff admitted that Mr. Ladolcetta's position was eliminated because his supervisor was unhappy with his performance and wanted to upgrade the position, and Plaintiff agreed with that assessment.  (Pl. Dep. at 183:18-186:19; Hasek Decl. Ex. E.)

131.     Similarly, Mr. Rhodes, who had been first hired when he was 54 years old and had his position eliminated when he was 60 years of age, was terminated as the result of a position elimination in a separate restructuring after which his skills did not match the requirements for the new position, combined with his questionable performance evaluations. (Hasek Dep. at 115:22-116:15, 187:3-8; Hasek Decl. Ex. F; Hasek Decl. ¶ 17.)

132.     Plaintiff concedes that the job restructurings and terminations were not limited to individuals who were older than 50 years of age and that "there were probably as many people if not more that were under 40 that were job eliminated."  (Pl. Dep. at 187:6-20.)

133.     Others of the selected individuals were related to circumstances unique to themselves.  For example, Mr. Krollman, the Chief Risk Officer for the Bank, was terminated after an investigation revealed conduct inconsistent with Bank policy.  (Hasek Dep. at 129:21-133:19.)

134.     As to Mr. Valentino, Plaintiff admitted that Mr. Valentino confided to him that the reason he was shown the door was that he was engaged in a political battle with Mr. Wallace (an American national and over the age of 50 himself) and in any event, had breached bank policy.  (Pl. Dep. at 176:24-179:2.)

135.     Notably, Mr. Yamawaki was not involved in any of the departures of the individuals identified by Plaintiff.  (Hasek Decl. ¶ 18.)

**Plaintiff's Allegations of National Origin Discrimination Are Contradicted By the Evidence**

136.     Neither Mr. Bamba, Mr. Baba, Mr. Yamawaki or anyone else at the Bank made any derogatory comments about Plaintiff's national origin.  (Pl. Dep. at 484:15-24.)

137.     Plaintiff originally alleged in his Charge of Discrimination filed with the Equal Employment Opportunity Commission that "during the period of time I was with BTM, the top-level positions within the Bank in the United States were General Manager (GM) and Deputy General Manager (DGM), which positions were, pursuant to Bank policy, staffed exclusively by Japanese nationals, and were unattainable by American nationals such as me."  (Kesselman Decl. Ex. LL ¶ 8.)

138.     In fact, American nationals have held and continue to hold General Manager positions at BTMU, including: Dennis Henderson (General Manager of Credit Examination),

Charles Hildner (General Manager of Audit), and Kris Stala (General Manager of Information Technology), who have held the positions during Plaintiff's employment, as well as Timothy Tracey (General Manager for the Credit Division), Bonnie Allen (General Manager for the Compliance Division), and Victor Sastri (Senior Vice President and Deputy General Manager for the Operations Division for the Americas, and Senior Vice President and Group Head of Credit Control), who have also taken on such positions since Plaintiff's employment was terminated. (Pl. Dep. at 128:2-3, 130:25-131:9; Hasek Dep. at 207:5-17; Hasek Decl. ¶ 29.)

139.    Plaintiff also alleged that American nationals were "blocked" from obtaining the positions of "Senior Vice President & Group Head" or "Senior Vice President & Manager." (Pl. Dep. at 382:25-383:10.)

140.    The positions of "Senior Vice President & Group Head" or "Senior Vice President & Manager" are essentially the same as the "Deputy General Manager" title. (Pl. Dep. at 383:6-9; Hasek Dep. at 210:3-7, 211:10-18.)[9]

141.    In fact, during Plaintiff's employment, there were numerous American nationals who held the position of Senior Vice President & Group Head and Senior Vice President & Manager. For example, in or around October 6, 2003, Mr. Patrick F. Reidy, an American national, was promoted to the position of "Senior Vice President & Group Head", after having been a "Senior Vice President and Manager" before that. (Hasek Decl. ¶ 21, Ex. D.)

142.    Similarly, in or around October 6, 2003, Mr. George Stewart, an American national, was promoted to the position of "Senior Vice President & Group Head" for the Global Relationship Management Group, after having been a "Senior Vice President and Manager"

---

[9]     Kuroda testified that he was the Senior Vice President/Group Head of the Securitization Group and had never held the title of Deputy General Manager (Kuroda Dep. at 6:9-24) and Yamawaki testified that, in his capacity as General Manager, his immediate reports held the title of Senior Vice President/Group Head. (Yamawaki Dep. at 40:23-42:7.)

before that.  (Hasek Decl. ¶ 21, Ex. D.)   Similarly, Mr. Dominick Sabella held the position of Senior Vice President and Group Head for the Comptrollers Headquarters for the Americas. (Hasek Decl. ¶ 25, Ex. H.)

143.    In or around October 6, 2003, Charles Francavilla, an American national, became the Senior Vice President & Group Head for Transaction Business, having previously held the position of "Senior Vice President & Manager."  (Hasek Decl. ¶ 21, Ex. D.)

144.    At the time of the above position changes, Mr. John Jeffers, also an American national, was promoted to "Senior Vice President & Manager."  (Hasek Decl. ¶ 21, Ex. D.)

145.    Similarly, Gus Browne, an American national, held the position of "Senior Vice President & Manager," while American nationals William Paine and Jack Demes both held titles of Vice President & Manager.   (Hasek Decl. ¶ 20, Ex. C.)

146.    There were no less than 40,  out of 103 officer level personnel, New York/New Jersey-hired employees who held "Manager," "Group Head," "Deputy General Manager," or "General Manager" positions, all of whom were American nationals as of the date of Plaintiff's termination. (Hasek Decl. ¶ 30.)

147.    BTMU also brought in employees from its Tokyo, Japan headquarters ("Home Office employees") to work in the United States on a rotational basis.  These Home Office employees were, coming as they were from Japan, Japanese nationals.  (Pl. Dep. at 71:11-72:6.)

148.    Plaintiff does not allege that locally-hired employees of Japanese national origin were provided with greater opportunities for the alleged positions about which Plaintiff complains.  Rather, he alleges that Home Office employees, who were of course Japanese, were rotated into positions and that he was not given the opportunity to obtain such positions.  (Pl. Dep. at 71:14-72:6.)

149.     The rotations of these positions were for two or three years, sometimes longer, after which Home Office staff would be rotated back to Japan.  (Pl. Dep. at 74:4-75:4, 139:22-140:19.)

150.     When a Japanese national was rotated out of the Americas and back to headquarters in Japan, the individual did not know what or where his/her next assignment would be.  (Pl. Dep. at 139:25-140:19; Kuroda Dep. at 5:12-22, 8:9-15.)

151.     One of the reasons for placing Home Office staff into these positions was to provide training so as to enable management in headquarters to make a determination as to whether this individual could be promoted further within headquarters in Japan.  (Pl. Dep. at 137:22-138:7.)

152.     Indeed, Plaintiff believed that the title of Deputy General Manager or Senior Vice President & Group head given to Home Office employees in his department did not reflect their actual role in the group, but instead believed that they were merely titles provided to them as "part of an overall career advancement program" for when they returned from their rotations to Japan.  (Kesselman Decl. Ex. MM.)

153.     Plaintiff was given significant responsibilities, and in his own view held a more important role than the Senior Vice President & Group Head for the Securitization group.  (Pl. Dep. at 252:16-23.)

154.     Plaintiff's view of the "SVP & Manager" role was that "[t]he SVP & Manager, for the purpose of providing checks and balances, has the back office and planning function under his direct supervision.  Aside from his responsibilities of reporting and administrative oversight, the most significant role performed by the SVP & Manager is the internal

implementation and coordination of the aforementioned business side actions." (Kesselman Decl. Ex. MM.)

155.     The positions of General Manager, Deputy General Manager, or Senior Vice President & Group Head within the IBDA were paid less than the position held by Plaintiff. (Pl. Dep. at 78:9-19, 143:5-17.)

156.     Plaintiff's compensation was substantially higher than the positions of General Manager and SVP-Group Head (or Deputy General Manager) for IBDA and the Securitization group for the Americas and Plaintiff would not have been willing to accept such a position which carried a lower rate of pay than he was earning. (Pl. Dep. at 78:9-19, 143:5-17.)

157.     For example, Mr. Bamba, the General Manager of Investment Banking for the Americas, informed Plaintiff that his total compensation was $250,000.00. (Pl. Dep. at 78:9-17.)

158.     The Senior Vice President & Group Head position for the Securitization Group, IBDA was filled by Mr. Baba on October 19, 2001. (Hasek Decl. ¶ 3.)

159.     The Senior Vice President & Group Head position for the Securitization Group, IBDA was next filled by Mr. Kuroda in May 2005. (Kuroda Dep. 7:8-11.) Neither Mr. Yamawaki nor Mr. Hasek believed that Plaintiff was appropriate to be considered for a position more senior than the SVP position he held. (Yamawaki Decl. ¶ 3; Hasek Decl. ¶ 15.)

160.     Plaintiff is not aware of what the actual requirements were for the Deputy General Manager/SVP & Group Head position in the Investment Banking Division within the Americas. (Pl. Dep. at 134:4-8.)

161.     Although Plaintiff suggested that he would have been prepared to transfer to another country, he has limited his acceptable relocation choices to London or Tokyo. (Pl. Dep. at 141:9-142:8.)

**<u>Facts Related to Plaintiff's Contractual and Quasi-Contractual Claims</u>**

162.    Plaintiff received an offer letter dated May 13, 1992, which he accepted by countersigning on May 14, 1992.  In the letter, Plaintiff acknowledged that the Bank maintained an employment-at-will policy which meant that either the Bank or the employee could "discontinue employment with or without cause."  The offer letter also provided, and Plaintiff accepted, that "[t]his policy and most other policies which affect your employment at the Bank are described in the Staff Member Handbook.  Any pre-employment verbal agreements are superceded by the policies contained in this Handbook."  (Pl. Dep. at 62:23-63:14; Kesselman Decl. Ex. H.)

163.    The Employee Handbooks, which were distributed throughout Plaintiff's employment at the Bank, and which Plaintiff acknowledged in writing that he received, reiterated the nature of the at-will relationship between employees and the Bank.  (Pl. Dep. at 63:17-65:20; Hasek Decl. Exs. J-N; Kesselman Decl. Exs. I, J, K.)

164.    Plaintiff signed the Handbook Acknowledgement Form in or around April 1, 1996, March 23, 2001, October 31, 2002, and December 23, 2003 (each time he received a new iteration of the Handbook), and therein agreed that:

- "no member of management has any authority to represent to any employee, either orally or in writing, that this Handbook or any particular personnel Policy or procedure contained in it, is or may be viewed as an agreement or as a commitment to me or other employees, and no such representation shall be binding upon the Bank."

- "**MY EMPLOYMENT RELATIONSHIP WITH THE BANK IS TERMINABLE AT THE WILL OF EITHER PARTY AND THAT IT IS TERMINABLE WITH OR WITHOUT CAUSE AND WITH OR WITHOUT PRIOR NOTICE.**"  (Emphasis in original.)

(Pl. Dep. at 63:17-65:20; Kesselman Decl. Ex. I.)

- 36 -

165.     Every Employee Handbook distributed throughout Plaintiff's employment stated at the outset the following language:

> *This handbook is not a contract, express or implied, guaranteeing employment for any specific duration.  Although we hope that your employment relationship with the Bank will be mutually satisfying, either you or the Bank may terminate your employment at any time, for any reason, with or without cause and with or without prior notice.  In addition, please understand that no supervisor, manager or representative of the Bank other than a Human Resources Manager has the authority to enter into any agreement with you for employment for any specified period of time or to make any promises or commitments which bind the Bank in matters relating to your employment with the Bank or in any way to modify the Bank's written policies contained in this Handbook or published elsewhere.  Further, no such agreement entered into by a Human Resources Manager shall be enforceable unless it is in a formal written agreement and signed by both you and a Human Resources Manager.*

(Kesselman Decl. Exs. J, K; Hasek Decl. Exs. J-N) (emphasis in original).

166.     Plaintiff understood that his employment with the Bank was at-will.  (Pl. Dep. at 57:22-58:13, 62:19-63:14.)

167.     Plaintiff alleges that when he was hired by Mark Iijima of the Bank, he was made a promise that if he performed well, he would not be fired, and that if he did not perform well and did a "bad job", he would not remain in the Bank's employ.  (Pl. Dep. at 56:19-57:3, 57:16-21.)

168.     Plaintiff admits that he did not believe that Mr. Iijima's alleged statement was a contract guaranteeing him high pay and continued employment.  Indeed, Plaintiff testified, "Did I understand that Mr. Iijima was entering into a contract with me when he made that statement? No, I didn't view it as a contract but what I viewed it as being was some type of a covenant, lower case.  You do a good job, you are around.  This is the way the business works." (Pl. Dep. at 58:18-24.)

169.     Mr. Ijiima's statement to Plaintiff was not in writing.  (Pl. Dep. 82:21-24.)

170.     Plaintiff alleges that a second promise was made in 1999 or 2000, in which Mr. Shoto Yasuda, the General Manager of Planning and Human Resources, promised him increases in compensation and job security "and that his compensation would be 'protected on the downside.'"  (Pl. Dep. at 49:12-25, 51:15-52:9, 79:19-81:20.)

171.     Plaintiff alleges that a colleague had called Mr. Yasuda because Plaintiff had told him that he was thinking about leaving.  Mr. Yasuda then "called me [Plaintiff] into his office and he asked me about what my plans were, and I was frank with him and I told him that there were a lot of other people that were put in similar positions that were being paid more than I was.  What he told me at that time was that I might be able to go to another institution and make more money but then number one if I went to a new institution, I would not know the institution that well.  They could be – could be a bank that would pay me a lot of money for a short period of time and then let me go.  At Bank of Tokyo-Mitsubishi I had (A) job security and (B), protection on the down side.  And he used that term.  He said you may not be paid as much here, in the future but you are going to have down side protection."  (Pl. Dep. at 50:16-52:8.)

172.     Mr. Yasuda did not tell him that he would never be fired.  (Pl. Dep. at 80:15-22.)

173.     Plaintiff understood Mr. Yasuda's reference to "downside protection" to mean that his bonus would not be cut substantially, but that he could lose $10,000 to $20,000 less than in a prior year, but that was the extent to which his compensation might be reduced.  (Pl. Dep. at 81:12-20.)

174.     Mr. Yasuda's alleged promise was never given to Plaintiff in writing.  (Pl. Dep. at 82:18-24.)

175.     There were no other alleged promises made to Plaintiff.  (Pl. Dep. at 78:20-79:18.)

176.     When asked to identify any other offers which he rejected in reliance on Mr. Yasuda's "promise", Plaintiff identified a position at West Deutsche Bank.  (Pl. Dep. at 92:4-6.)

177.     However, Plaintiff admitted it was never an offer, but rather a conversation in which he recommended a colleague for the position and that this opening occurred a couple of years before his conversation with Mr. Yasuda.  (Pl. Dep. at 94:7-95:9.)

178.     Plaintiff also identified a position leading the securitization group at Societe Generale.  (Pl. Dep. at 97:14-19.)  However, Plaintiff admitted that this opportunity was not, in fact, a job offer, but rather a conversation with a headhunter about a possible position which he chose not to pursue.  (Pl. Dep. at 98:6-99:3.)

179.     In addition, Plaintiff allegedly had "conversations" with CIBC, but that he never pursued the opportunity there and did not receive a formal offer.  (Pl. Dep. at 103:8-21.)

180.     Plaintiff does not have first-hand knowledge of the compensation packages that were being offered at other banks.  (Pl. Dep. at 100:3-10, 100:23-101:3, 101:18-24.)

Dated:  New York, New York
          August 30, 2007

Respectfully submitted,

SEYFARTH SHAW LLP

By: s//  Dov Kesselman
      Dov Kesselman (DK-6571)
      Gloria Galant (GG-2818)
620 Eighth Avenue
New York, New York 10018-1405
Telephone:  (212) 218-5500
Fax:  (212) 218-5526

Attorneys for Defendant The Bank of Tokyo-
Mitsubishi UFJ, Ltd.