UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――――――

VINCENT P. DELUCA,

                  Plaintiffs,

     - against –

THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.,

               Defendants.
―――――――――――――――――――――――――――――――

06 Civ. 5474 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

    The plaintiff, Vincent P. Deluca, brings this action against his former employer, the Bank of Tokyo Mitsubishi UFJ, Ltd. ("BTMU").  The plaintiff alleges that the defendant discriminated against him on the basis of his national origin (American) and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(a). The plaintiff also asserts claims of breach of express and implied contract, and fraudulent inducement based on oral promises he allegedly received from a senior manager at BTMU.

    The defendant moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the Amended Complaint in its entirety.

**I.**

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114–15 (2d Cir. 1998) (collecting cases).

## II.

The evidence submitted to the Court reflects the following facts as construed in the light most favorable to the plaintiff. The plaintiff began his employment with BTMU on June 2, 1992, when he was forty-six years of age. (Def. 56.1 Stmt. ¶ 1; Pl.

56.1(b) Stmt. ¶ 1.)  The plaintiff was born on April 1, 1946.
(Def. 56.1 Stmt. ¶ 2; Pl. 56.1(b) Stmt. ¶ 2.)

The plaintiff was hired as an Investment Banking
Specialist/Vice President in the Investment Banking Group at a
salary of $115,000. (Def. 56.1 Stmt. ¶ 3; Pl. 56.1(b) Stmt. ¶
3.) As set forth in his offer letter and in the employee manuals
distributed to the plaintiff during his employment, the
plaintiff's employment with the Bank was at-will.  The plaintiff
claims that Mr. Shoto Yasuda, a person in a top management
position at BTMU, made certain representations to him which
altered the terms of his otherwise at-will employment. (Def.
56.1 Stmt. ¶ 4; Pl. 56.1(b) Stmt. ¶ 4.)[1]

Also embodied in BTMU's employee manuals was an equal
employment opportunity policy, which requires that BTMU's
employment decisions be made "without regard to race, color,
national origin, religion, age, sex, disability. . . or any
other protected status."  The policy also provided that "[t]he
Bank expressly prohibits any form of unlawful discrimination or
unlawful harassment" and makes it the responsibility of
supervisors and managers to create an atmosphere free of
discrimination or harassment and to immediately report any
information regarding discrimination or harassment to the Human
Resources Group."  Employees are warned that "unlawful

---

[1] These alleged statements form the basis of the plaintiff's contract claims, and are

harassment or unlawful discrimination by an employee will not be tolerated, and appropriate disciplinary action, up to and including termination of employment, will be taken against anyone who violates this Policy." (See Def. 56.1 Stmt. ¶¶ 15-16; Pl. 56.1(b) Stmt. ¶¶ 15-16.)

Two years after he began working at BTMU, on or about November 1, 1994, the plaintiff was promoted to Senior Vice President. (Def. 56.1 Stmt. ¶ 5; Pl. 56.1(b) Stmt. ¶ 5.) Annual bonuses were part of the plaintiff's compensation package. His bonus increased from $105,000 in 1995 to $320,000 in 1999, and more than doubled to $670,000 in 2000, bringing his total compensation to $850,000 for that year. The plaintiff's bonus remained at this level for 2001. In 2002, the plaintiff received a bonus of $590,000, and in 2003 the plaintiff's bonus was reduced to $425,000. In 2004 the plaintiff's bonus was further reduced to $410,000. (Def. 56.1 Stmt. ¶¶ 105-07, 110, 111, 114, 116-17; Pl. 56.1(b) Stmt. ¶¶ 105-07, 110, 111, 114, 116-17.) BTMU attributes this reduction to the tightening of the job market in or around 2002 and 2003, and asserts that bonus compensation levels were reduced for many employees as a result of internal cost-cutting. The plaintiff claims that the reductions in his bonus compensation were the result of age and

---

not directly relevant to his claims of discrimination.

national origin discrimination. (Def. 56.1 Stmt. ¶¶ 114, 116;
Pl. 56.1(b) Stmt. ¶¶ 114, 116.)

On May 12, 2005, the plaintiff was informed that BTMU was
terminating his employment. BTMU claims that the termination was
the result of inappropriate behavior by the plaintiff in
connection with the impending transfer of his supervisor, Mr.
Koji Baba.  In early May 2005, upon learning that Mr. Baba, who
is Japanese and a senior officer of BTMU, was returning to
BTMU's headquarters in Tokyo, the plaintiff made several
comments to Mr. Baba, first by telephone and then twice in
person, that Mr. Baba was being reassigned to Baghdad, Iraq.
(Def. 56.1 Stmt. ¶ 23; Pl. 56.1(b) Stmt. ¶ 23.)  On May 3, 2005,
the plaintiff sent Mr. Baba an e-mail with the subject line
"Your Next Office" to which he attached a picture of a crowded
room of Asian employees working in a clerical setting. (Def.
56.1 Stmt. ¶ 24; Pl. 56.1(b) Stmt. ¶ 24.)  The plaintiff does
not dispute that he specifically selected the picture because it
depicted a crowded office of employees such as might be
encountered by Mr. Baba upon his return to Japan. (Def. 56.1
Stmt. ¶ 25; Pl. 56.1(b) Stmt. ¶ 25.)

Mr. Baba, who explained that he was upset by the email,
reported it to Thomas Hasek, BTMU's head of Human Resources, and
to  Mitsuhiro Yamawaki, the General Manager of the Investment
Banking Division for the Americas, to whom Mr. Baba and the

plaintiff ultimately reported.  (Def. 56.1 Stmt. ¶¶ 29, 39; Pl. 56.1(b) Stmt. ¶¶ 29, 39.)  According to the defendant, Mr. Yamawaki consulted Mr. Hasek and Beryl Lewis, also in the Human Resources department, for a recommendation of the appropriate response.  Mr. Hasek and Ms. Lewis recommended that the plaintiff's employment be terminated.  Mr. Yamawaki initially noted his concern that the plaintiff's termination would impact BTMU's securitization business, but claims he nonetheless accepted this recommendation and decided to terminate the plaintiff's employment.  (Def. 56.1 Stmt. ¶¶ 72-73; Pl. 56.1(b) Stmt. ¶¶ 72-73.)

On May 6, 2005, Mr. Yamawaki advised the Global Head of Securitization in Japan, Mr. Tetsuga Sato, that he intended to terminate the plaintiff's employment because of his recent conduct with respect to Mr. Baba and prior incidents "that leave questions about his qualifications as [a Senior Vice President]" but that because of his contributions over the years severance pay should still be considered. (Def. 56.1 Stmt. ¶ 74; Pl. 56.1(b) Stmt. ¶ 74.)  On May 7, 2005, Mr. Yamawaki emailed Mr. Sato again.  The email explained that because the incident occurred when BTMU was planning to expand securitization activities, they were forced to make a "difficult decision" but were able to reach it by thinking about the "positive effect overall." The email described the decision:

> [T]he individual up to now repeatedly has made
> inappropriate comments during bank meetings and spoken and
> behaved inappropriately toward colleagues and supervisors,
> and this incident is not the only one.  As [a Senior Vice
> President] required to have a strong ethical sense and self
> control, I concluded that he is not suitable for
> management, and upon consulting with both Personnel and
> Legal here, [I] made this decision.

(Def. 56.1 Stmt. ¶ 75; Kesselman Decl. Ex. GG.)

Mr. Yamawaki also met with Kyota Omori, the Chief Executive Officer for the Americas. He informed Mr. Omori that he had reached the decision to terminate the plaintiff's employment after having sought the advice of Human Resources and Legal, showed him the plaintiff's May 3, 2005 email, and advised Mr. Omori that he was in the process of obtaining approval from Toyko. (Def. 56.1 Stmt. ¶ 76; Pl. 56.1 Stmt. ¶ 76.) [2]  Mr. Yamawaki directed the preparation of a Request of Termination for Human Resources which was drafted by Mr. Baba, and signed by Mr. Yamawaki.  The Request identified the reasons for the plaintiff's termination, and highlighted his shortcomings with respect to teamwork with other senior management, leadership,

---

[2] Upon the defendant's motion, Magistrate Judge Fox granted a protective order precluding the deposition of Mr. Omori.  Magistrate Judge Fox determined that Mr. Omori had neither personal knowledge of relevant facts nor unique knowledge with regard to the termination of the plaintiff's employment. (See Mem. and Order, dated Aug. 30, 2007.) The plaintiff filed objections to the Magistrate Judge's decision pursuant to Rule 72 of the Federal Rules of Civil Procedure, and this Court affirmed the Magistrate Judge's decision. (See Order, dated Oct. 9, 2007.)  Magistrate Judge Fox subsequently awarded costs and attorney's fees to the defendants because he found that the plaintiff's notice of intent to depose Mr. Omori and his opposition to the defendant's motion for a protective order were not substantially justified. (See Mem. and Order, dated Dec. 18, 2007.)  The plaintiff continues to assert that Mr. Omori was a decisionmaker in the plaintiff's termination and to request a continuance to allow for the taking of Mr. Omori's deposition.  The plaintiff's 56(f) request will be addressed below, but the issue of Mr. Omori's relevancy has already been litigated and is no longer at issue.

role modeling of junior staff, and adherence to Bank policies and procedures.  The Request noted that, since 2002, Mr. Deluca's performance appraisals had identified these areas as ones in which improvement was needed, but that he had failed to improve.  (Def. 56.1 Stmt. ¶ 79; Pl. 56.1(b) Stmt. ¶ 79.) The plaintiff was terminated on May 12, 2005, just over a week after he sent the email to Mr. Baba.  (Def. 56.1 Stmt. ¶¶ 82-86; Pl. 56.1(b) Stmt. ¶¶ 82-86.)

The plaintiff claims that his termination was not the result of the email, which according to him was only a "joke", but a result of a long-standing BTMU practice of denying promotions to, compressing bonus compensation of, and ultimately terminating the employment of American bankers at BTMU who were in their fifties and older.  Mr. Deluca claims that the email served as a mere pretext for this discriminatory termination. (Pl. 56.1(b) Stmt. ¶ 72.)  Moreover, the plaintiff disputes that Mr. Yamawaki, Mr. Hasek, and Ms. Lewis were the only decisionmakers involved in his termination.  The plaintiff asserts that in addition to consulting with the BTMU employees listed above, Mr. Yamawaki also consulted with several high ranking officials in Japan, including Mr. Sato, concerning his termination. (Pl. 56.1(b) Stmt. ¶¶ 74-75.)  The plaintiff alleges that he was the recipient of several ageist and racist comments by other BTMU employees, which will be addressed below.

### III.

The defendant claims that the plaintiff cannot establish his claims of age and national origin discrimination.  The defendant asserts first that the plaintiff adduced no evidence that could raise an inference of discrimination, and second that BTMU's decision to terminate the plaintiff was based upon the improper email which was a legitimate, non-discriminatory reason that the plaintiff cannot establish is pretextual.

### A.

The ADEA makes it unlawful for an "employer" "to discharge any individual" who is at least forty years of age "because of such individual's age." 29 U.S.C. §§ 623(a), 631(a). Title VII of the Civil Rights Act makes it "an unlawful practice for an employer to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  Similarly, the state and local statutes prohibit discrimination on the basis of age and national origin.  <u>See</u> New York State Human Rights Law, N.Y. Exec. Law § 296; New York City Human Rights Law, N.Y.C. Admin. Code § 8-107.

The plaintiff's claims of discrimination of the basis of age and national origin, brought pursuant to Title VII, ADEA and

the New York State and City Human Rights Laws, are evaluated at the summary judgment stage by the burden-shifting analysis that governs Title VII, established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Dawson v. Bumble & Bumble, 398 F.3d 211 (2d Cir. 2005)(noting burden-shifting Title VII analysis also applies to discrimination claims under the NYSHRL and NYCHRL).[3]

To establish a prima facie case of employment discrimination under Title VII and the ADEA, a plaintiff must show that:  (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination.  See McDonnell Douglas, 411 U.S. at 802; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); James v. New York Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000); Vinson v. City of New York, No. 04 Civ. 7769, 2007 WL 965338, at *4 (S.D.N.Y. March 30, 2007). If the plaintiff meets his minimal burden of establishing a prima facie case, the burden of production then shifts to the

---

[3] Some courts have noted that the NYCHRL is to be construed more liberally than both Title VII and the NYSHRL. See Ochei v. Coler/Goldwater Memorial Hosp., 450 F.Supp.2d 275, 282-83 (S.D.N.Y. 2006) (citing New York State cases holding that the NYCHRL should be more liberally construed than Title VII and the NYSHRL). However, in the absence of direct evidence of discrimination, the same burden-shifting analysis applied in Title VII and the NYSHRL applies to the NYCHRL. Id. (citing Farrugia v. N. Shore. Univ. Hosp., 820 N.Y.S. 718, 726 (N.Y. Sup. Ct. 2006).

defendant to offer a legitimate, nondiscriminatory rationale for the adverse employment action.  See St. Mary's Honor Ctr., 609 U.S. at 506-07; McDonnell Douglas, 411 U.S. at 802-03; James, 233 F.3d at 154.

If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-56 (1981); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001); Darrell v. Consol. Edison Co. of New York, Inc., No. 01 Civ. 8130, 2004 WL 1117889, at *8 (S.D.N.Y. May 18, 2004).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253; see also Reeves v. Sanderson Plumbing Co., 530 U.S. 133, 143 (2000); Darrell, 2004 WL 1117889, at *8.

The Court of Appeals for the Second Circuit has instructed that in determining whether the plaintiff has met this burden, a court is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and

any other evidence that supports [or undermines] the employer's case." James, 233 F.3d at 156 (quoting Reeves, 530 U.S. at 148-49); see also Darrell, 2004 WL 1117889, at *8.  Although summary judgment must be granted with caution in employment discrimination actions, "where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." Chambers, 43 F.3d at 40 (citation omitted); see also Singh v. New York City Off-Track Betting Corp., No. 03 Civ. 5238, 2005 WL 1354038, at *7 (S.D.N.Y. June 8, 2005).

## B.

The plaintiff carries the initial burden under the McDonnell Douglas framework of making out a prima facie case of discrimination.  The plaintiff has satisfied the first three prongs of the prima facie case.  The plaintiff was a fifty-six year old American at the time of his termination, and thus a member of a protected class.  The plaintiff has further demonstrated that he was qualified for his position,[4] and suffered an adverse employment action.  However, the plaintiff

---

[4]  The defendant appears to argue that the plaintiff's alleged history of policy violations and improper conduct prevent the plaintiff from establishing the second element of the prima facie case, that he satisfactorily performed his job at the time of his termination.  The evidence as to the plaintiff's previous improper conduct is disputed by the plaintiff, and in any event the testimony by Mr. Yamawaki that he was concerned about terminating the plaintiff because of the adverse effect it might have on the business establishes that the plaintiff, for the purposes of the prima facie case, was otherwise performing satisfactorily at the time of his termination.  Further, the defendant seemed to concede this point at oral argument. (See Summ. J. Hr'g Tr. 2, Feb. 27, 2008.)("But for this e-mail, would Mr. DeLuca still be working at Bank of Tokyo-Mitsubishi? And the answer, based on the evidence, is resoundingly, yes,

has failed to establish the fourth prong, that he was terminated under circumstances giving rise to an inference of discrimination.

The circumstances of the plaintiff's termination do not raise an inference of discrimination.  He was terminated after having mocked the fact that Mr. Baba, his supervisor, was being relocated to the employer's head office in Tokyo.  He followed that up by sending an insensitive racially charged picture to Mr. Baba which the plaintiff thought was a joke.  Mr. Baba did not take it as a joke and reported it to Mr. Yamawaki, the person in charge of both the plaintiff and Mr. Baba, as well as to the head of the Human Resources Department.  Upon the advice of the Human Resources Department, with legal input, Mr. Yamawaki decided to terminate the plaintiff.  Mr. Yamawaki advised the head office in Tokyo that he had made the decision to terminate the plaintiff.  The plaintiff was terminated nine days after sending the offensive e-mail.  There were no comments made in the course of the termination process that reflected any ageist or national origin bias in the termination.  Indeed, the only comment the plaintiff can point to from Mr. Yamawaki is a comment that Mr. Yamawaki made about his own age compared to that of his children, at some unspecified time which the plaintiff did not consider disparaging.  The timing and

---

he would.")

circumstances of the plaintiff's termination do not suggest any inference of discrimination.

The plaintiff attempts to develop eight points that he contends constitute direct evidence of discrimination.  He refers to his fifty-four page declaration submitted in opposition to the current motion, rather than his deposition testimony.  He also points to his Local Rule 56.1(b) Statement, most of which fails to point to any admissible evidence.  The plaintiff has failed to offer admissible evidence to establish any inference that his termination occurred under circumstances giving rise to an inference of discrimination.

## 1.

At the outset, the plaintiff fails to contravene most of the facts that the defendant sets forth because he does not comply with the procedural rules governing a motion for summary judgment.  The plaintiff relies on a largely inadmissible Rule 56.1(b) Statement of Disputed Facts in order to establish an inference of discrimination.  Local Rule 56.1 requires that each numbered paragraph in the movant's Statement of Undisputed Facts be deemed admitted unless "specifically controverted by a correspondingly numbered paragraph" and "followed by citation to evidence which would be admissible" in accordance with Rule 56(e) of the Federal Rules of Civil Procedure.  Local Civ. R. 56.1(b)-(d).  The defendant's Rule 56.1 Statement meticulously

15

cites the admissible evidence to support each of the allegedly
undisputed facts.  The plaintiff's 56.1(b) Statement, on the
other hand, frequently notes that the corresponding numbered
paragraph in the defendant's 56.1 Statement is "disputed, and in
any event is a matter for testimony and cross-examination at
trial" without stating any facts which controvert the
defendant's statement or citing to admissible evidence.  (See
Pl. 56.1(b) Stmt. ¶¶ 28, 29, 30, 34, 36-40, 42-48, 54.)  Several
paragraphs in the 56.1(b) Statement state that "it is
anticipated" that other witnesses might testify to certain facts
at trial.  (Pl. 56.1(b) Stmt. ¶¶ 48-50, 122, 129-31.) It is
insufficient for the purposes of a motion for summary judgment
to say that the evidence will be developed at trial.  See Fed.
R. Civ. P. 56(e) ("A supporting or opposing affidavit must be
made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant is competent
to testify on the matters stated."); Anderson, 477 U.S. at 248-
52 (stating that the plaintiff must put forward sufficient
admissible evidence from which a reasonable fact-finder could
return a verdict in his favor); Schnabel v. Abramson, 232 F.3d
83, 91 (2d Cir. 2000).  Although the plaintiff asserts that many
facts asserted by the defendant are "denied," they are actually
deemed admitted where the plaintiff fails to cite to admissible

evidence controverting the defendant's statements. See Fed. R. Civ. P. 56(e)(2).

The plaintiff's 56.1(b) Statement also relies on the plaintiff's own declaration, which relies on conclusory statements often unsupported by citations to the record, discussions that went on outside the plaintiff's presence, and hearsay statements that are unsupported by affidavits by the speakers.[5] A plaintiff can successfully resist a motion for summary judgment by submitting the plaintiff's own affidavit about what the defendant allegedly said or did.  However, an affidavit that is conclusory or not based on the plaintiff's personal knowledge would be insufficient to defend against a motion for summary judgment.  See Danzer v. Norden Systems, Inc., 151 F.3d 50, 57 n.5 (2d Cir. 1998) (citing Attorney General v. Irish Northern Aid Comm., 668 F.2d 159, 162 (2d Cir. 1982)).

Moreover, to the extent that the plaintiff's declaration contains assertions that plainly contradict his deposition testimony, those assertions are also inadmissible.  See Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); Durant v. A.C.S. State & Local Solutions Inc., 460 F. Supp. 2d

[5] For example, the plaintiff's declaration contains reference to (i) discussions that went on outside of the plaintiff's presence (see, e.g., Pl. Decl. ¶¶ 43, 51(d)); (ii) conclusions about BTMU's business or employees about which he cannot establish personal knowledge (see, e.g., Pl. Decl. ¶¶ 8, 31-34, 35(a), 49, 57, 58(a), 69, 72-77, 81, 82, 84, 85); and (iii) hearsay statements unsupported by affidavits from the alleged speakers (see, e.g. Pl.

492, 494 (S.D.N.Y. 2006). For example, the plaintiff asserted at his deposition that he had no personal knowledge of the circumstances surrounding the termination of other "older" individuals he named (Def. 56.1 Stmt. ¶¶ 121-22), but the declaration purports to set forth facts of their terminations that include allegedly improper age related motivations (see Pl. Decl. ¶¶ 58-61).

**2.**

Despite the infirmities of his 56.1(b) Statement and declaration, the plaintiff lists eight instances that he argues constitute direct evidence that his age or national origin were motivating factors in his termination. However, the plaintiff fails to allege any incidents sufficiently connected to the decision to terminate him from which an inference of discrimination may be drawn.

The first three items the plaintiff lists as direct evidence concern remarks by individuals at BTMU, namely Mr. Bamba, Mr. Baba, and Mr. Omori. To determine whether verbal comments constitute evidence of discrimination, courts look at the connection between the statements and the decision to terminate the plaintiff. As the Court of Appeals recently explained: "[T]he more remote and oblique the remarks are in relation to the employer's adverse action the less they prove

_____

Decl. ¶¶ 2, 23, 45, 81).

that the action was motivated by discrimination." Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007); see also Danzer, 151 F.3d at 56; Selzer v. Dresder Kleinwort Wasserstein, Inc., 356 F. Supp. 2d 288, 295 (S.D.N.Y. 2005).  In particular, "remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." Tomassi, 478 F.3d at 115.  There is no evidence that Mr. Bamba, Mr. Omori, or Mr. Baba made the decision to terminate the plaintiff.  Moreover, the comments themselves were separated in time and unrelated to the decision to terminate the plaintiff.

Mr. Bamba, whom the plaintiff contends attempted to get him to retire and scoffed at being told of the alleged oral promises by Mr. Yasuda of job "protection on the downside," left BTMU almost a year before the plaintiff's termination, and there is no evidence that he was contacted, notified, or involved in any way in the plaintiff's termination. (See Def. 56.1 Stmt. ¶¶ 9-12; Pl. 56.1(b) Stmt. ¶¶ 9-12.)

The plaintiff alleges that Mr. Omori made a comment over drinks at a Christmas party that he (Mr. Omori) was getting older.  However, Mr. Omori was similarly not a decisionmaker in the plaintiff's termination.  Moreover, the comment was clearly

too isolated and ambiguous to support an allegation of age discrimination.  See Pasha v. William M. Mercer Consulting, Inc., No. 00 Civ. 8362, 2004 WL 188077 (S.D.N.Y. Feb. 2, 2004) (finding that an employer's comments about his own age did not support an inference of discrimination).

The plaintiff alleges that Mr. Baba made a series of inappropriate references to the plaintiff's age, calling him an "old man" between ten and twenty times.  However, the plaintiff has failed to present any evidence that Mr. Baba was a decisionmaker in his termination.  The fact that Mr. Baba, as a subordinate to Mr. Yamawaki, drafted the plaintiff's termination memo for Mr. Yamawaki does not establish that he participated in the decision to terminate the plaintiff.  It is apparent that Mr. Yamawaki, once aware of the email that Mr. Deluca sent to Mr. Baba, consulted the Legal department and the Human Resources department before ultimately making the decision to terminate the plaintiff.  In any event, the comments by Mr. Baba that the plaintiff was an "old man" are too remote and disconnected from the termination to raise an inference of discrimination.  The plaintiff cites only one specific instance of Mr. Baba making the comment, and the incident cited did not relate to the plaintiff's job performance, occurred at least three years before the decision to terminate the plaintiff, and was

understood by the plaintiff to be a joke. (Def. 56.1 Stmt. ¶¶
93-95; Pl. 56.1(b) Stmt. ¶¶ 93-95.)

The plaintiff next attempts to create an inference of
discrimination by alleging facts relating to other employees'
terminations.  The plaintiff claims that William Rhodes and Jack
Demes testified at their depositions that age played a role in
their terminations.  Mr. Rhodes was terminated when his job was
eliminated in a restructuring by BTMU and Mr. Demes was
terminated when BTMU decided employing that two managers was
redundant.  However, in the excerpts of their deposition
testimony provided by the plaintiff, there is no mention by
either Mr. Rhodes or Mr. Demes that age played a role in their
termination or indeed that they were terminated for any
discriminatory reason.  The plaintiff does not allege any facts
that show discriminatory animus in connection with their
terminations.

The plaintiff refers to statements allegedly made to him by
several former employees, namely Lewis Hart, Gary Ladolcetta,
and James Wallace, that discriminatory motives were involved in
their terminations.  Because the plaintiff does not offer any
affidavits from these individuals, or any factual basis for
their allegations, his allegations constitute inadmissible
hearsay and cannot be considered on this motion for summary
judgment.  See Santos v. Murdock, 243 F.3d 681, 683 (2d Cir.

2001) (per curiam) ("Affidavits submitted to defeat summary
judgment must be admissible themselves or must contain evidence
that will be presented in an admissible form at trial.")
Further, the plaintiff's deposition testimony is void of any
evidence of personal knowledge as to the circumstances of the
departures of these employees.  (Def. 56.1 Stmt. ¶ 122; Pl.
56.1(b) Stmt. ¶ 122.)

     The plaintiff claims that the General Manager and Senior
Vice President Group Head positions in the business units of
BTMU were reserved exclusively for Japanese Home Office staff,
precluding the advancement of older Americans.  However, the
evidence establishes that American nationals have held and
continue to hold General Manager and Senior Vice President &
Group Head positions at BTMU.  (Def. 56.1 Stmt. ¶¶ 138-146.)
The plaintiff counters that every senior position held by an
American is in the area of audit, compliance, and risk control,
and that the Americans owe their positions to influence
exercised by the American government. (Pl. 56.1(b) Stmt. ¶¶ 138-
146.) However, the plaintiff only cites to portions of his own
declaration to establish this evidence, and conclusory
statements that lack foundation would not be admissible at
trial.  See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).
The plaintiff fails to establish that positions in the business
units were reserved exclusively for Japanese Home office staff,

and, apart from general allegations about pressure exercised by the federal government, fails to demonstrate why the advancement opportunities of Americans in audit, compliance, and risk control groups should be considered separately from the business groups.

Finally, the plaintiff claims that Mr. Baba, a younger Japanese national, who reported to Mr. DeLuca as of 2001, was promoted in October 2001 to become Senior Vice President Group Head of the Securitization Group, and remained in the position until April 2005, even though he had far less experience than Mr. DeLuca in securitization work.  Mr. Masura Kuroda, a younger Japanese national who reported to Mr. Deluca in the Securitization Group until April 2005, was next to become Senior Vice President Group Head of the Securitization Group.  The plaintiff argues this promotion occurred solely because the position was reserved exclusively for younger Japanese nationals on rotational assignment from the Tokyo office.  The fact that the plaintiff was not placed in this position does not suggest discrimination.  The defendant concedes that certain positions were filled by persons working in the United States on a rotational basis from Japan, but points out that the holders of the positions were paid much less than the plaintiff's salary. The plaintiff testified at his deposition that he would have been unwilling to take one of these lower paid positions. (Def.

56.1 Stmt. ¶ 156; Pl. Dep. at 143.) Finally, the defendant's demonstration that American nationals have held and continue to hold General Manger and Senior Vice President and Group Head positions at BTMU also undercuts the plaintiff's claim that these two promotions indicate discriminatory animus.

The plaintiff plainly has failed to present an evidentiary basis to support his allegation that his termination occurred under circumstances giving rise to an inference of discrimination.  He has thus failed to establish a prima facie case under the <u>McDonnell Douglas</u> burden-shifting framework.

### C.

Moreover, even if the plaintiff could make out a prima facie case under Title VII and the ADEA, the defendant has provided a legitimate, nondiscriminatory business reason for the termination, and the plaintiff has failed to establish that the stated reason for his termination was merely a pretext for discrimination.  BTMU asserts that the plaintiff was terminated in response to the email that he sent Mr. Baba on May 3, 2005, which violated BTMU's policies on harassment, appropriate email usage, and behavior expectations of senior managers.  Although the plaintiff asserts that the email was only a joke, he does not dispute that he sent the email to Mr. Baba, and purposefully selected the attached picture because it depicted Asians.  The decision to terminate a senior manager who fails to comply with

company policy or who sends inappropriate emails is a legitimate, non-discriminatory reason for termination.  See Vosatka v. Columbia Univ., No. 04 Civ. 2936, 2005 WL 2044857, at *9 (S.D.N.Y. Aug. 25, 2005).

### D.

Because BTMU has satisfied its burden of providing a legitimate nondiscriminatory reason for the adverse employment decision, the burden shifts to the plaintiff to show that the reason was merely a pretext for discrimination.  The issue is whether the plaintiff can carry his burden of persuasion, without the benefit of an inference of discrimination, such that a reasonable jury could conclude that the defendant's employment reasons are false and that age or national origin discrimination was a motivating factor in discharging the plaintiff.  The plaintiff can show pretext "either by presentation of additional evidence showing that the employer's preferred explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir. 1994).  The Court must examine the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [the] plaintiff." Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).

The plaintiff attempts to argue that the reasons provided for his termination were simply pretexts for age or national origin discrimination but he has failed to adduce evidence that his conduct was simply a pretext for his termination.

The plaintiff argues that the pattern of his reduced bonuses support his claim of pretext.  However, while the plaintiff's bonus was reduced in 2002, the plaintiff himself conceded that the reason for reduction in his bonus was that bonuses were reduced during periods of poor job opportunity. (See Def. 56.1 Stmt. ¶ 117; Pl. 56.1(b) Stmt. ¶ 117; Kesselman Aff. Ex. JJ.) The plaintiff remained the highest paid member of the Securitization Group, and his bonus was one of the top four highest bonuses paid in the Bank in the Americas.  (Def. 56.1 Stmt. ¶ 118; Pl. 56.1(b) Stmt. ¶ 118.) Even if the comments Mr. Bamba allegedly made during bonus compensation discussions in April 2002 and May 2003 could be considered, they are not sufficiently temporally linked to the termination to show discriminatory motive.  Moreover, Mr. Bamba left the United States in June 2004, nearly a year before the plaintiff's termination.  Mr. Bamba clearly had no role in his termination and therefore his remarks cannot contribute to a finding of pretext.

The plaintiff argues that BTMU failed to investigate meaningfully the email, including failing to interview the

plaintiff, but this does not demonstrate pretext. The evidence shows that Mr. Yamawaki consulted the Human Resources department and the Legal department and considered the appropriate response to the email.  Based on the advice of professional advisers, he reached a reasoned response.  The rapidity of the response, after consultation, supports the conclusion that the email was in fact the reason for the termination.

The plaintiff also attempts to allege pretext by arguing that he was the only person to have been terminated for sending this type of email, but he fails to submit any evidence that other senior managers sent comparable emails of which BTMU was aware at the time but were not terminated.  He also is not able to show, as he insists, that other BTMU employees were not disciplined for similar emails of which BTMU was aware.  The plaintiff does not offer any admissible evidence that supports his allegations that the email was a post-termination attempt to justify his termination.

Finally, the plaintiff's allegations of post-termination conduct are speculative and factually unsupported.  The plaintiff offers no admissible evidence to support his claims that BTMU leaked the details of his termination to staff or engaged in post-termination retaliatory behavior apart from his own conclusory affidavit.  The plaintiff does not explain why BTMU's severance package offer or consultation with top

management suggest that the reasons given for his termination at the time were not true reasons for his termination.

This is a case where the defendant has presented a clear reason that brought about a prompt decision to terminate the plaintiff after consultation with Human Resources and Legal personnel.  The plaintiff's proof of his prima facie case is weak at best.  The plaintiff is unable to show pretext, and it is not sufficient for purposes of summary judgment to assert, as the plaintiff does, that the plaintiff will be able to demonstrate pretext at trial. As discussed above, the plaintiff's prima facie case is weak at best, and the plaintiff does not offer "additional evidence" to show that BTMU's legitimate reason for terminating him is false.  The strength of the defendant's reason for his termination is strong given that the plaintiff himself had engaged in conduct that was contrary to the defendant's policies and involved the plaintiff sending a racially offensive email to his supervisor that followed other offensive conduct.  The evidence proffered to show pretext does not show that the reason was pretextual.  No reasonable jury could find, based on all the evidence that the reason for the plaintiff's termination was discrimination based on race or age. See generally, Woodman v. WWOR-TV, 441 F.3d 69 (2d Cir. 2005); Singh v. New York City Off-Track Betting, No. 03 Civ. 5238, 2005 WL 1354038 (S.D.N.Y. June 8, 2005); Alleyne v. Four Seasons

Hotel-New York, 99 Civ. 3432, 2001 WL 135770 (S.D.N.Y. Fed. 15,
2001), aff'd 25 Fed. Appx. 74 (2d Cir. 2002).

**E.**

In his opposition to the motion for summary judgment, the
plaintiff submitted the sworn report of Dr. Laurence Tatum.  The
report reviewed the employment and termination statistics of
BTMU for the period beginning on January 1, 2002 and ending on
May 12, 2005, when the plaintiff was terminated, and concluded
that employees over fifty years of age were at a higher
probability of involuntary termination than those under fifty.

The plaintiff attempts to rely upon the affidavit to help
establish his prima facie case and to show pretext.  The
defendant contends that the plaintiff's submission is untimely
and inadmissible for failure to comply with Rule 26(a)(2)(C) of
the Federal Rules of Civil Procedure.

The Court's Scheduling Order in this case required that all
discovery be completed by June 29, 2007. (Order, dated Nov. 28,
2006.) This deadline was subsequently extended by Magistrate
Judge Fox to July 11, 2007. (Order, dated June 25, 2007.)  The
plaintiff never disclosed that he would be relying upon the
testimony of an expert, and the defendant was not made aware of
the expert until the plaintiff submitted his opposition papers
on November 13, 2007.  Federal Rule of Civil Procedure
26(a)(2)(C) provides, in relevant part:

29

> These [expert] disclosures shall be made at the times and
> in the sequence directed by the court.  In the absence of
> other directions from the court or stipulation by the
> parties, the disclosures shall be made at least 90 days
> before the trial date or the date the case is to be ready
> for trial...

Fed. R. Civ. P. 26(a)(2)(C).

Rule 37(c)(1) of the Federal Rules of Civil Procedure

provides, in relevant part:

> A party that without substantial justification fails to
> disclose information required by Rule 26(a) . . . is not,
> unless such failure is harmless, permitted to use as
> evidence at a trial, at a hearing, or on a motion any
> witness or information not so disclosed."

Fed. R. Civ. P. 37(c)(1).  The purpose of the rule is to prevent

the practice of "sandbagging" an opposing party with new

evidence.  See Ebewo v. Martinez, 309 F. Supp. 2d 600, 607

(S.D.N.Y. 2004); Ventra v. United States, 121 F. Supp. 2d 326,

332 (S.D.N.Y. 2000).  Courts in this Circuit recognize that

preclusion of evidence pursuant to Rule 37(c)(1) is a drastic

remedy and should be exercised with discretion and caution.

Rhone v. United States, 04 Civ. 5037, 2007 WL 3340836, at *8 n.6

(S.D.N.Y. Nov. 9, 2007); Ventra, 121 F. Supp. 2d at 332. No

showing of bad faith is required in order to exclude evidence

pursuant to Rule 37.  Design Strategy v. Davis, 469 F.3d 284,

296 (2d Cir. 2006).

In this case, the plaintiff offers no substantial

justification for failing to disclose the expert or produce the

declaration until four months after the close of discovery.  The plaintiff argues that the scheduling order in this case did not address the time frame for pretrial disclosures respecting experts, and that the Court did not set a firm trial date.

However, the Court's scheduling order required that all discovery be completed before the extended deadline on July 11, 2007.  Courts in this Circuit have routinely held that the deadlines for the completion of "all discovery" in a scheduling order necessarily includes expert discovery.  See Zahler v. Twin City Fire Ins. Co., No. 04 Civ. 10299, 2007 WL 4563417, at *2 (S.D.N.Y. Dec. 21, 2007); Brenton v. Cons. Rail Corp., No. 00 Civ. 742, 2006 WL 1888598, at *2 (W.D.N.Y. July 7, 2006); Semi-Tech Litigation LLC v. Bankers Trust Co., 219 F.R.D. 324, 325 (S.D.N.Y. 2004); Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A., No. 01 Civ. 1047, 2002 WL 31108380, at *3 (S.D.N.Y. Sept. 23, 2002).  The plaintiff's disclosures were therefore not timely.

The plaintiff also stated that he was not aware there was a need for expert analysis until he reviewed BTMU's motion papers, which contain "paragraph after paragraph concerning overall statistics." (Summ. J. Hr'g Tr. 28.)  However, the defendant's 56.1 Statement and corresponding motion papers do not contain extensive statistical analysis.  Indeed, as evident from the discussion above, this Court has not relied on any statistical

analysis of the Securitization Group.  The defendant set forth
the demographic information of the Securitization Group of which
the plaintiff was a part, but this does not constitute
statistical analysis.  In addition, the chart provided by BTMU
in its Motion for Summary Judgment was provided to the plaintiff
as early as October 28, 2005, in BTMU's Statement of Position to
the EEOC.  (See Ex. B to Def. letter dated March 4, 2008.)  The
content of the charts are the same, and that information was
available to the plaintiff long before the expiration of the
discovery deadline.

The plaintiff also claimed that the defendant did not
produce documents until May 29, 2007, one month before the
scheduled close of discovery on June 29, 2007.  However, the
plaintiff did not request documents until April 27, 2007, five
months after discovery commenced, and received one extension of
the discovery deadline to July 11, 2007.  However, the plaintiff
did not raise any need for an expert, and did not seek
additional time for that purpose.

The delay in producing the expert report prejudiced the
defendant, because the defendant made the summary judgment
motion on the record established at the close of discovery.  The
defendant did not have an opportunity to depose Mr. Tatum or to
consult an expert of its own.  If that report had any
significance to the current motion, the defendant would have the

opportunity to depose Dr. Tatum, employ its own expert, and submit additional briefing on the motion or file an additional motion.  All of this would cause additional expense and delay. This is the type of "sandbagging" of adversaries that Rule 37(c)(1) was designed to prevent, and therefore Dr. Tatum's affidavit will be excluded from consideration.  See Ebeowo, 309 F. Supp. 2d at 607.

The exclusion of the expert report is not unfair to the plaintiff.  As the Supreme Court stated in Hickman v. Taylor, 329 U.S. 495, 507 (1947), "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.  To that end, either party may compel the other party to disgorge whatever facts he has in his possession. . . thus reducing the possibility of surprise."  The plaintiff knew the evidence that he would require to prevail on his discrimination claims and to survive a motion for summary judgment.

In any event, the plaintiff's expert report is ultimately unhelpful to his case.  Consideration of that report does not affect the outcome of the present motion.  The report does not support the plaintiff's allegation of pretext, or supply evidence of discrimination against the plaintiff.  The report analyzes employment and termination statistics of BTMU as a whole, but the generalized statistics do not provide support for

the plaintiff's claim that Mr. Yamawaki's decision to terminate him was motivated in any way by his age or national origin. Although statistics are admissible in a disparate treatment case involving a single plaintiff, statistical evidence alone may not suffice to make out a prima facie case of discrimination. See Martin v. Citibank, N.A., 762 F.2d 212, 219 (2d Cir. 1985) (noting statistical evidence alone ordinarily cannot establish a prima facie case of disparate treatment under Title VII or § 1981); Bussey v. Phillips, 419 F. Supp. 2d 569 (S.D.N.Y. 2006) (collecting cases).  Depending on the statistics, they may be used along with other evidence to establish a genuine factual dispute such to survive summary judgment.  See Catanzaro v. Weiden, 140 F.3d 91, 96 (2d Cir. 1998) (statistics showing racial disparity combined with discriminatory comments by a decisionmaker created reasonable inference of a systematic policy of racial discrimination to preclude summary judgment on equal protection claim).  In this case, however, Dr. Tatum's report does not focus on the relevant groups of which the plaintiff was a part, such as the Securitization Group or the Investment Banking Division, or employees that Mr. Yamawaki supervised.  The statistics are too broad to support a finding of discrimination against the plaintiff.

Therefore, the defendant's motion for summary judgment dismissing the plaintiff's claims of age and national origin discrimination under federal, state, and city law is granted.


**IV.**

The plaintiff also asserts several claims under New York law for alleged breach of express and implied contract and fraudulent inducement. The plaintiff alleges that in or around the year 2000, he had a discussion with Shoto Yasuda, then the head of Planning and Human Resources at BTMU.  According to the plaintiff, he was considering leaving BTMU at that time because of his inadequate bonus compensation, but was promised "job security" and "protection on the downside" by Mr. Yasuda in exchange for agreeing to remain at BTMU.  The promises were never reduced to writing, but according to the plaintiff were later discussed with Mr. Bamba after the plaintiff's bonus compensation was cut in 2002, and are referenced in certain BTMU documents.  On the basis of this conversation, the plaintiff alleges claims for breach of express or implied contract and fraudulent inducement.

**A.**

The plaintiff alleges that Mr. Yasuda's promise of "job security" and "protection on the downside" formed an express or

implied contract that was breached by his termination on May 12, 2005 and by the reduction in his bonus between 2002 and 2005.

The plaintiff was indisputably an employee at-will, as confirmed in his offer letter. The Employee Handbook, which the plaintiff signed in 1996, 2001, 2002 and 2003, stated that "my employment relationship with the Bank is terminable at the will of either party and that it is terminable with or without cause and with or without prior notice." (Def. 56.1 Stmt. ¶¶ 162-66; Pl. 56.1(b) Stmt. ¶¶ 162-66.)  The plaintiff, however, argues that he understood the terms of the at-will employment to be superseded by the oral promises made to him. (Id.)

The plaintiff cannot rebut the existence of an at-will employment agreement without showing that he was made aware of a written policy expressly limiting the defendant's right of termination and that the plaintiff relied on that policy to his detriment.  See Fitzgerald v. Martin-Martietta, 681 N.Y.S.2d 895, 897 (App. Div. 1998).  Moreover, "'oral assurances. . .cannot of themselves give rise to a triable question of fact' as to the existence of a contractual relationship." Albert v. Loksen, 239 F.3d 256, 264 (2d Cir. 2001)(quoting Fitzgerald, 681 N.Y.S.2d at 897.)

The plaintiff submits that this case is analogous to Weiner v. McGraw Hill, Inc., 443 N.E.2d 441 (N.Y. 1982), where the New York Court of Appeals held that the plaintiff's at-will

36

employment terms were not fatal to the existence of a binding contract based upon an oral promise that the plaintiff would not be discharged without "just and sufficient cause." Id. at 460. However, Weiner involved a written provision in the employee manual that employees would not be terminated without just and sufficient cause.  This provision was central to the Weiner analysis, as were other facts such as that the plaintiff had been instructed that any termination of employees had to be in compliance with the employee manual's "just cause" provision. See id.; see also Lobosco v. New York Tel. Co/NYNEX, 751 N.E.2d 462, 466 (N.Y. 2001).  In this case, there was no provision BTMU's employment manual that buttressed or reinforced any promise orally given to the plaintiff.  Weiner therefore does not help the plaintiff.

New York courts also will not give contractual effect to vague generalizations about compensation. See Albert, 239 F.3d at 264-65, Enowitz v. Sanwa Bus. Credit Corp., 902 F.Supp. 59, 63 (S.D.N.Y. 1995)(finding "assurances. . .of long-term employment" insufficiently definite to be enforced). The plaintiff testified that he understood "downside protection" to mean that his bonus would not be substantially reduced. However, the phrase "downside protection" does not translate into terms specific enough to form an agreement.  The amount of the bonus was still clearly in the defendant's discretion.  See

Freedman v. Pearlman, 706 N.Y.S. 2d 405, 408 (App. Div. 2000)
(finding alleged promises of "fair compensation" and to
"equitably divide the draw" too indefinite to be enforced).

The plaintiff also cannot establish the existence of an
implied contract.  There is no implied obligation of good faith
and fair dealing in an at-will employment relationship under New
York law.  See Murphy v. Amer. Home Prods., Inc., 448 N.E.2d 86,
91 (N.Y. 1983)("It would be incongruous to say that an inference
may be drawn that the employer impliedly agreed to a provision
which would be destructive of his right to termination."); Lobel
v. Maimonides Med. Ctr., 835 N.Y.S.2d 28 (App. Div. 2007);
McGimpsey v. J. Robert Folchetti & Assocs., LLC, 798 N.Y.S.2d
498 (App. Div. 2005).

The plaintiff's claims for breach of express and implied
contract must therefore be dismissed.

**B.**

The plaintiff's fraudulent inducement claim also fails.  A
claim for fraudulent inducement under New York law requires the
plaintiff to show (1) a material representation, (2) known to be
false, (3) made with the intention of inducing reliance, (4)
upon which the plaintiff actually relied, (5) which caused the
plaintiff to suffer a detriment, (6) and that the plaintiff's
reliance was reasonable. Superior Technical Res., Inc. v. Lawson
Software, Inc., 851 N.Y.S.2d 74, 84 (App. Div. 2007); Merrill

Lynch, Pierce, Fenner & Smith v. Wise Metals Group, LLC, 798 N.Y.S.2d 14, 15 (App. Div. 2005).

The plaintiff's claim fails for several reasons. Under New York law, claims of fraudulent inducement based on future promises of continued employment in an at-will employment context are not cognizable. See Brady v. Calyon Securities (USA), 406 F. Supp. 2d 307, 316-17 (S.D.N.Y. 2005)(citing New York law). Any reliance upon a promise of future employment is unreasonable because an employee can be dismissed at any time. See Marino v. Oakwood Care Ctr., 774 N.Y.S.2d 562, 563 (App. Div. 2004); Arias v. Women in Need, Inc., 712 N.Y.S.2d 103, 103 (App. Div. 2000).

Moreover, the plaintiff failed to demonstrate actual reliance upon the promise. While the plaintiff has identified discussion with other potential employers, he failed to identify any offers that he decided to forego. (Def. 56.1 Stmt. ¶¶ 176-79; Pl. 56.1(b) Stmt. ¶¶ 176-79.) He testified at his deposition that he did not forego any actual employment opportunities. Thus, he can not allege that he relied to his detriment on any of the promises.

Finally, a claim of fraudulent inducement in New York requires the fraudulent misrepresentation to be one of a then-existing fact. See Stamelman v. Fleishman-Hillard, Inc., No. 02 Civ. 8318, 2003 WL 21782645, at *6 (S.D.N.Y. July 31, 2003).

Beyond conclusory allegations, the plaintiff has adduced no evidence to show that Mr. Yasuda's alleged promises were false and known to be false when made.

The plaintiff's claim for fraudulent inducement must be dismissed.

**V.**

The plaintiff requests a continuance for additional discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  This request is plainly dilatory and should not be granted.  Rule 56(f) of the Federal Rules of Civil Procedure provides,

> "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

Fed. R. Civ. P. 56(f). It is well-established that a party resisting summary judgment on the grounds that the party needs additional discovery must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts. See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999); Cooney v. Consol. Edison, 220 F.Supp.2d

241, 247-48 (S.D.N.Y. 2002), aff'd, 63 Fed. Appx. 579, 2003 WL
21105351 (2d Cir. 2003); see also Estevez-Yalcin v. Children's
Vill., 331 F.Supp.2d 170, 179-80 (S.D.N.Y. 2004).  Mr. Deluca
has submitted an affidavit stating that he seeks additional
discovery including further document production by BTMU and the
depositions of Mr. Baba, Mr. Omori, Mr. Satou, Mr. Akikusa, and
Mr. Sakomoto, or a Rule 30(b)(6) deposition of BTMU.

    The plaintiff attempts to justify why this requested
discovery was not conducted within the time limits by pointing
out that, although the plaintiff initially requested one year
for discovery, the Court only allowed about seven months to
complete discovery.  However, seven months to complete discovery
in a straightforward employment discrimination case was
certainly ample time, and the plaintiff could have sought an
extension of the discovery cutoff if he needed more time.  One
extension was in fact granted.  The plaintiff also accuses the
defendant of discovery abuse, but the plaintiff could have
sought assistance from the Magistrate Judge to whom the case was
assigned if the defendant was obstructing discovery.  In fact,
the Magistrate Judge granted a protective order against the
plaintiff's efforts to take the deposition of Mr. Omori because
there was no showing that Mr. Omori had relevant personal
knowledge.  The plaintiff unpersuasively claims that he did not

seek to extend the discovery deadline beyond July 11, 2007 because the defendant opposed an extension.

"The trial court may properly deny further discovery if the nonmoving party has had a fully adequate opportunity for discovery." Trebor Sportswear, Inc. v. The Limited Stores, Inc., 865 F.2d 506, 511-12 (2d Cir. 1989). Although the plaintiff complains of inadequate time for discovery, it is undisputed that the plaintiff waited five months to begin discovery.  He made his First Request for the Production of Documents and noticed depositions of five employees on April 27, 2007. In light of this, his complaints of insufficient time are unavailing because he brought the time constraints on himself. Moreover, the plaintiff's complaint that he was unable to depose several witnesses who were allegedly only disclosed in discovery is baseless because those witnesses appeared on the plaintiff's original list of persons with knowledge. See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 927-28 (2d Cir. 1985) ("A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need."); JSC Foreign Economic Association Technostroyexport v. Int'l Dev. and Trade Serv., Inc., 386 F.Supp.2d 461, 477-78 (S.D.N.Y. 2005). The request for additional time for discovery is therefore

denied.

## CONCLUSION

The court has carefully considered all of the arguments raised by the parties.  To the extent not addressed specifically above, they are either moot or without merit.  For the reasons stated above, the defendant's motion for summary judgment (Doc. # 22) is **granted**.  The clerk is directed to enter judgment for the defendant and to close the case.

SO ORDERED.

Dated: New York, New York
       March 29 , 2008

                                    _____
                                    John G. Koeltl
                                    United States District Judge